# In The Matter Of:

*TODD FARBER, ET AL.*

*v.*

*DOUGLAS PAUL BEVERIDGE, ET AL.*

---

*MICHAEL K. SPODAK, M.D. - Vol. I*

*April 23, 2013*

---

**M E R R I L L   L A D.**

1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax: 202.861.3425

PLAINTIFF'S
EXHIBIT

3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


--------------------------------X

TODD FARBER, et al.,             X

    Plaintiffs             X     Civil No.

v.                               X   DKC 11 CV 1580

DOUGLAS PAUL BEVERIDGE, et al., X

    Defendants              X

--------------------------------X



Deposition of

MICHAEL K. SPODAK, M.D.

Towson, Maryland

Tuesday, April 23, 2013

11:30 A.M.



Job No. 1-231650

Pages 1 - 114

Reported By:  Sharon D. Livingston, CSR-RPR

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 2

1         Deposition of MICHAEL K. SPODAK, M.D.,
2    held at the offices of:
3
4         MICHAEL K. SPODAK, M.D., P.A.
5         26 West Pennsylvania Avenue
6         Towson, Maryland 21204-5001
7         (410) 337-0343
8
9         Pursuant to Notice, before Sharon D.
10   Livingston, Registered Professional Reporter and
11   Notary Public of the State of Maryland.
12
13
14
15
16
17
18
19
20
21
22

Page 4

1         C O N T E N T S
2    EXAMINATION OF MICHAEL K. SPODAK, M.D.        PAGE
3    By Ms. Porwick                5
4
5
6         E X H I B I T S
7    (Attached to Deposition Transcript)
8    SPODAK EXHIBITS                  PAGE
9    Exhibit 1  Spodak curriculum vitae          6
10   Exhibit 2  Table of Contents            21
11   Exhibit 3  Articles on selective mutism,    25
12        tab 16
13   Exhibit 4  Correspondence            27
14        chronologies, intake sheet,
15        Spodak affidavit, tab 17
16   Exhibit 5  Spodak handwritten notes, tab 27   28
17   Exhibit 6  Spodak evaluation notes          29
18        tab 40
19   Exhibit 7  Wikipedia material, tab 41       29
20   Exhibit 8  Ambulance and fire reports, tab 45  29
21   Exhibit 9  Timeline Pre              29
22   Exhibit 10 Academic                31

Page 3

1         A P P E A R A N C E S
2
3
4    ON BEHALF OF THE PLAINTIFFS:
5         KATHARINE O. PORWICK, ESQUIRE
6         SALSBURY, CLEMENTS, BEKMAN,
7           MARDER & ADKINS, LLC
8         300 West Pratt Street, Suite 450
9         Baltimore, Maryland 21201
10        (410) 539-6633
11
12
13   ON BEHALF OF THE DEFENDANTS:
14        THOMAS V. McCARRON, ESQUIRE
15        SEMMES, BOWEN & SEMMES
16        25 South Charles Street, Suite 1400
17        Baltimore, Maryland 21201
18        (410) 539-5040
19
20
21
22

Page 5

1         P R O C E E D I N G S
2         MICHAEL K. SPODAK, M.D.,
3         having been duly administered the oath,
4         testified as follows:
5         EXAMINATION ON BEHALF OF PLAINTIFFS
6    BY MS. PORWICK:
7         Q   Dr. Spodak, my name is Katy Porwick.  I
8    represent the Farber family in this litigation.  I
9    know you've given depositions many times before.  I
10   will tell you that if you don't understand my
11   question, if it does not make medical sense, you
12   have to let me know so that I can restate it.  Fair
13   enough?
14        A   Yes.
15        Q   Also if you can't hear me or if I'm
16   mumbling, please tell me because it's obviously
17   important that you hear my question.  Okay?
18        A   Yes.
19        Q   We could be here for a little while, so if
20   you need a break at any point don't hesitate to tell
21   me.  I'll be happy to accommodate you.  I've been
22   provided with a copy of your CV, which I'm going to

2 (Pages 2 to 5)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 6

1  have marked as Exhibit 1.
2     (Spodak Exhibit 1 marked for
3  identification and attached to transcript.)
4  BY MS. PORWICK:
5     Q   You're a board-certified psychiatrist.  Is
6  that right?
7     A   Yes.
8     Q   Are you board-certified in anything else?
9     A   Psychiatry and neurology.
10    Q   Do you have any subspecialties?
11    A   Forensic psychiatry.
12    Q   What about child and adolescent
13  psychiatry?
14    A   That is not a subspecialty, although over
15  the years I've evaluated numerous children.
16    Q   Are you a board-certified child and
17  adolescent psychiatrist?
18    A   No.
19    Q   Are you board eligible for the child and
20  adolescent psychiatry boards?
21    A   I don't believe so, no.
22    Q   Where did you do your residency?

Page 7

1     A   Johns Hopkins.
2     Q   What part of your residency if any was
3  devoted to psychiatry for children and adolescents?
4     A   I had at least six months of formal
5  training in child psychiatry.  Throughout my
6  residency I dealt with adolescents as well.
7     Q   Just to make sure that we're using the
8  terms in the same way, what does child mean to you,
9  what ages?
10    A   I would say the cutoff between child and
11  adolescent is typically age 12.  Adolescents are
12  considered 12 to 18.  Children are considered
13  newborn to age 12.
14    Q   Do you currently hold any privileges at
15  any hospital?
16    A   No.
17    Q   Let me ask it this way.  Do you hold a
18  medical license in Maryland?
19    A   Yes.
20    Q   Has your medical license in Maryland ever
21  been acted unfavorably upon?
22    A   No.

Page 8

1     Q   What about your privileges, have your
2  privileges ever been revoked or suspended in any
3  way?
4     A   No.
5     Q   You had hospital privileges at some point.
6  Is that correct?
7     A   Yes.
8     Q   And you let them lapse?
9     A   I didn't let them lapse.  Currently in
10  psychiatry hospital-based people have a separate, I
11  guess for lack of a better term, it's not a
12  specialty but a concentration.  People don't
13  typically do inpatient and outpatient anymore, and I
14  confine my practice to outpatient.
15    Q   You're still seeing patients in a clinical
16  setting.  Is that right?
17    A   Yes.
18    Q   If you have a patient that has an
19  emergency that requires hospitalization, you're not
20  able to care for them in the hospital.  Is that
21  right?
22    A   Yes.

Page 9

1     Q   Have you ever had that occasion?  Have you
2  ever had that happen?
3     A   Ever had patients who needed
4  hospitalization?  Numerous times, sure.
5     Q   And you didn't continue to provide them
6  care because you didn't have privileges at the
7  hospital?
8     A   I would refer them to a hospital, and when
9  they were discharged I'd pick up their care.
10    Q   Let's talk about your professional time.
11  On a scale of 100, just your professional time, not
12  your personal time, how much of it is in a clinical
13  setting?
14    A   Probably about 30 percent.  The remaining
15  70 percent is forensic.
16    Q   How long has that been the case?
17    A   The last year or two.  Before that the
18  split was more like 60/40 toward forensic.
19    Q   Of the forensic work that you do, the 70
20  percent of your time approximately, what of that is
21  criminal, and what is civil?
22    A   Probably ten percent is criminal, and the

3 (Pages 6 to 9)

MICHAEL K. SPODAK, M.D. - 4/23/2013

**Page 10**

1  remainder is civil.
2    **Q   When you are seeing patients in a clinical**
3  **setting are you providing therapy, or are you doing**
4  **medication management?**
5    A   A little of both. More medication
6  management, a little bit of therapy.
7    **Q   When you do medication management for a**
8  **patient, are they then seen by another healthcare**
9  **professional for therapy?**
10    A   Can you repeat that?
11    **Q   Sure.   When you are doing medication**
12  **management for a patient, are they seen by another**
13  **healthcare provider for ongoing talk therapy?**
14    A   Sometimes. Sometimes it's just medication
15  management.
16    **Q   Of your current patients that you see in a**
17  **clinical setting, how many of them are children?**
18    A   None. I don't provide treatment for
19  children. I only provide evaluations for children.
20    **Q   In your private practice have you ever**
21  **provided treatment for children?**
22    A   No.

**Page 11**

1    **Q   In your career have you ever provided**
2  **treatment for adolescents?**
3    A   Yes.
4    **Q   How many of your current patients are**
5  **adolescents?**
6    A   None.
7    **Q   When was the last time you had a patient**
8  **that was an adolescent?**
9    A   I don't remember. It's been at least a
10  few years or more.
11    **Q   Why do you not see children in a clinical**
12  **setting?**
13    A   Because I think the treatment of children
14  is best done by child psychiatrists. The evaluation
15  of children can often be done by forensic
16  psychiatrists.
17    **Q   Why the distinction?**
18    A   Because there's a big difference between
19  evaluating children and treating them.
20    **Q   What's the difference?**
21    A   One is you're treating them. You're
22  providing medication, prescribing therapy. The

**Page 12**

1  other is you're doing an evaluation usually in a
2  forensic setting. Most of the ones I've done have
3  been for custody, but I've done a number of them for
4  traumatic injuries, lead paint exposure, a variety
5  of things.
6    **Q   What makes you qualified to do an**
7  **evaluation of a child if you're not qualified to**
8  **treat a child?**
9      MR. MCCARRON: Objection.
10    A   I don't understand the question nor how to
11  answer it.
12    **Q   Okay.   You testified that you don't**
13  **believe you're qualified to treat a child?**
14      MR. MCCARRON: Objection.
15    A   I didn't say that. I'm not a specialist
16  in child psychiatry. I'm qualified to evaluate
17  children. I could probably treat them if I put my
18  mind to it, but I haven't had occasion nor an
19  interest in treating children. It's usually
20  confined to people who are child psychiatrists.
21  However, within the practice of general psychiatry
22  there's no prohibition to treating children.

**Page 13**

1    **Q   So you choose not to treat children in a**
2  **clinical setting?**
3    A   Correct.
4    **Q   What's the distinction in terms of**
5  **evaluating them in a forensic setting that you make**
6  **the choice to evaluate them in a forensic setting?**
7  **What is the difference?**
8    A   I think evaluating them in a forensic
9  setting is a rather unique procedure which involves
10  interviewing the parents, interviewing the children,
11  looking at a variety of collateral sources, trying
12  to come up with certain opinions that will be
13  applicable in a legal setting. That is very
14  distinct from treating children where you simply
15  take what they say or what their family says at face
16  value, deal with the problem at hand, look for
17  therapy or look for medication, but you don't
18  usually look for a specific causation to a
19  reasonable degree of medical certainty, which is
20  applicable to a court setting.
21    **Q   Wouldn't you agree with me that although a**
22  **child psychiatrist who is treating a child may not**

4 (Pages 10 to 13)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 14

1  look for causation to a reasonable degree of medical
2  certainty, they are often looking for the cause of a
3  problem that brings the child to the psychiatric
4  setting?
5      A  It depends on the situation.  Most often
6  they simply take what the family says at face value
7  and don't make a concerted effort to look at the
8  complete picture to see whether there are other
9  factors that might be a cause or not because they're
10  not focused on reaching an opinion to reasonable
11  medical certainty about causation.  If someone comes
12  in and says this is what's bothering me, and I think
13  this is why, they don't do an exhaustive
14  investigation as to whether that is really the case
15  or there are other factors involved or it may be a
16  different cause.
17      Q  In fact, though, in terms of treating a
18  patient, don't you have to look at the underlying
19  causes to see if they are accurately reporting or to
20  see if there's another cause that they may not even
21  be considering which in fact may be exacerbating the
22  condition?

Page 15

1      A  I think you make some attempt to do it.
2  Typically you don't do the kind of exhaustive review
3  that you do in forensic psychiatry.  You merely take
4  the patient and the family at face value.  Your
5  focus is on reducing symptoms, not on looking for a
6  specific cause that will be applicable in a court
7  setting.
8      Q  What if the cause is something that keeps
9  triggering the response?  In that scenario don't you
10  need to find the cause to be able to either
11  eliminate it or reduce it?  For example, if the
12  cause of some type of reaction by a child is the way
13  they're being parented or some type of abuse, don't
14  you need to pinpoint what the cause is to be able to
15  help treat them?
16      A  First of all, I think you asked a whole
17  bunch of different questions in your question.  I
18  don't understand your question.  I'm sorry.
19      Q  Let me try and break it down.  Wouldn't
20  you agree with me that there are scenarios in which
21  when you're treating a patient in a clinical
22  setting, that you need to in fact identify the cause

Page 16

1  to help eliminate it so that the child can progress
2  in their therapy?
3      A  I think at specific conditions you do the
4  best you can, but you don't typically do the kind of
5  exhaustive review that is in my opinion necessary to
6  appropriate testify in court about causation.
7      Q  There is the possibility for a
8  professional to be both a forensic psychiatrist and
9  a child and adolescent psychiatrist.  Is that
10  right?
11      A  You mean as a treating psychiatrist and a
12  forensic psychiatrist?
13      Q  No.  To have board certifications in both
14  child and adolescent psychiatry and forensic
15  psychiatry.
16      A  Yes, you can have boards in both.
17      Q  You told me that you don't see any
18  children in your clinical practice.  In your
19  forensic practice how many children do you evaluate
20  on a monthly basis on average?
21      A  I don't really know how to give you an
22  average.  I can say over the years there have been

Page 17

1  dozens, if not hundreds, when you add together
2  custody evaluations, traumatic injuries, and lead
3  paint evaluations.
4      Q  Are you able to break that down further on
5  a yearly or monthly basis, for example, on average I
6  see two or three kids in a forensic case, or I see
7  one child?
8      A  It's probably two or three a year I think
9  over the years, maybe a couple more.
10      Q  What about adults in a forensic setting?
11  How frequently do you do evaluations of adults on
12  monthly basis?
13      A  Weekly.
14      Q  How many weekly?
15      A  Usually two a week.
16      Q  Is there a board certification for
17  geriatric psychiatry?
18      A  For geriatric?
19      Q  Yes.
20      A  Yes.
21      Q  What age are you considered to be a
22  geriatric patient if you're treating patients?

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 18

1    A  I don't know that there's a specific
2  cutoff.
3    Q  Do you treat geriatric patients in a
4  clinical setting?
5    A  Depending on the age cutoff, yes.  I treat
6  patients who are 65, 70, thereabouts.
7    Q  My mom would not like that to be the
8  definition of geriatric.
9    A  I wouldn't either at my age.
10   Q  Have you ever treated a patient who either
11 had selective mutism while you were treating them or
12 had a past diagnosis of selective mutism?
13   A  I don't recall any I have treated with
14 that condition.
15   Q  Would you agree with me that selective
16 mutism is a condition that is more likely to be
17 prevalent in the children population?
18   A  In children?  Yes, I would.
19   Q  What is selective mutism?
20   A  What is it?
21   Q  Yeah.
22   A  You mean like the DSM-IV definition of it?

Page 19

1    Q  Is that going to be your definition?  Will
2  you follow the definition of the DSM-IV?
3    A  I have no dispute with the DSM-IV
4  definition of it, so yes, I would subscribe to that.
5    Q  We're getting ready to have a new edition
6  of the DSM sometime here in the near future.  Is
7  that right?
8    A  I believe it's due out in May of this
9  year.
10   Q  Do you know whether there's any change in
11 the definition of selective mutism between the
12 DSM-IV and the new version, the DSM-V?
13   A  No, I don't.
14   Q  Have you ever done a forensic evaluation
15 of a child regarding selective mutism before?
16   A  I suspect over the years there have been
17 children who have had it, but I have not done one
18 specifically to determine whether the child had it
19 or not.
20   Q  When were you first contacted about this
21 case?
22   A  I believe sometime over the summer of

Page 20

1  2011.
2    Q  What was to be your role in the case as
3  you understood it?
4    A  Excuse me?
5    Q  What was to be your role in the case as
6  you understood it?
7    A  I was asked to review records and do an
8  evaluation of [redacted] and determine what if
9  any impact the automobile accident in 2008 had on
10 her.
11   Q  Have you ever worked with Mr. McCarron
12 before?
13   A  Yes.
14   Q  On how many occasions?
15   A  I don't know how many occasions, but I've
16 done numerous cases with Semmes, Bowen & Semmes over
17 the years as well as with your law firm.
18   Q  In the cases in which you've worked with
19 Mr. McCarron in the past, have they dealt with
20 evaluations of children?
21   A  I don't recall any specific ones in the
22 past in that regard, no.  I don't recall any that

Page 21

1  have involved evaluations of children.
2    Q  After Mr. McCarron or someone in his
3  office contacted you about participation in the case
4  were you provided with materials?
5    A  Yes.
6    Q  Did you review materials regarding Lindsey
7  Farber prior to your evaluation of her?
8    A  Yes.
9    Q  I have been provided by Mr. McCarron with
10 a copy of your report and a copy of something called
11 a table of contents.  Did you author this?
12   A  Yes.  I would add that since my submitting
13 the report I have been provided with some additional
14 records.
15      MS. PORWICK:  If we could mark this as
16 Exhibit 2, please.
17      (Spodak Exhibit 2 marked for
18 identification and attached to transcript.)
19 BY MS. PORWICK:
20   Q  What's listed on Exhibit 2 are the
21 materials that you had reviewed prior to authoring
22 your report?

6  (Pages 18 to 21)

MICHAEL K. SPODAK, M.D. — 4/23/2013

Page 22

1  A  Yes.
2  Q  And since that time you've been provided,
3 I presume with additional depositions and the report
4 of plaintiff's rebuttal expert Dr. Brian
5 Zimnitzky?
6  A  As well as medical records.
7  Q  I want to ask you a few questions about
8 what certain things mean here.  Number 5 says
9 miscellaneous.  Do you know what that is?
10  A  Miscellaneous in this case consists of
11 medical records from a variety of sources.
12  Q  May I look at your number 5, please?
13 Thank you.  There are highlightings on these
14 records.  Did you put on the highlights?
15  A  Yes, except possibly for the dates.  I
16 have one of my office assistants highlight the
17 dates.  Anything else other than the date is
18 highlighted by me.
19  Q  And you highlight things that you think
20 are significant?
21  A  I'm sorry.  Once again.
22  Q  I mumbled.  I apologize.  You highlight

Page 23

1 things that you think are significant?
2  A  They're either significant, or I'm not
3 sure if they're significant until further records
4 come in.  Some I put on a timeline.  Some I just
5 highlight because I want to review other things to
6 see how they fit in chronologically.  They're
7 highlighted for several reasons.
8  Q  Do you know who put this packet of
9 miscellaneous materials that you've included under
10 number 5, which are medical records and school
11 records?
12  A  Do I know who printed them?
13  Q  Who put them together in this fashion?
14  A  I did.
15  Q  And why?
16  A  I'm not sure.  I mean at the time when I
17 went through records I pulled records that I thought
18 might have some particular significance out of the
19 other records.  Some ended up having significance.
20 Some didn't.
21  Q  Are the records that are included in
22 number 5 also included in other places, meaning

Page 24

1 these are copies that you copied from other
2 locations, or did you pull them from other
3 locations?
4  A  No.  I think they're copies that are also
5 contained in other locations.
6  Q  Number 6 on your list is CO.  Is that
7 complaint?
8  A  Yes.
9  Q  Number 7 is PL ATI.  Is that plaintiff's
10 answers to interrogatories?
11  A  Yes.
12  Q  Number 9 is CCAS, and it lists the name
13 Ruth Simon, LCSW-C.  What is CCAS?
14  A  Child Center and Adolescent Services.
15  Q  You can have number 5 back.  Thank you for
16 allowing me to review it.  While you're down there,
17 number 16 is articles.  Could you please pull those
18 out?  The articles that are encompassed in number
19 16, who gathered these?
20  A  I did.
21  Q  When in terms of your work on the case did
22 you put together tab 16?

Page 25

1  A  Looks like from the printout on the top of
2 the page, October 2011.  I think they were in the
3 fall of 2011.
4  Q  Why did you pull articles on selective
5 mutism?
6  A  Because, as I indicated earlier, I hadn't
7 evaluated someone with selective mutism, and I
8 wanted to review the literature and see particularly
9 whether there was any information or research about
10 causation and etiology for selective mutism.
11  Q  Did you print out all of the articles that
12 you found, or do you ever read articles online and
13 don't print them all out?
14  A  Yes, I read articles online that I do not
15 print out.  I attempted to print out ones that
16 focused primarily on any information related to
17 causation or etiology.
18  Q  I'd like to have these marked as Exhibit
19 3.  Are you okay with me putting the exhibit sticker
20 on the tab 16?
21  A  Sure.  That's fine.
22      (Spodak Exhibit 3 marked for

7 (Pages 22 to 25)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 26

1    identification and attached to transcript.)
2    BY MS. PORWICK:
3        Q   Other than this research that you did in
4    October of 2011 or thereabouts, have you gone on to
5    do any additional research regarding selective
6    mutism?
7        A   Recently I did a computer search to see if
8    there was any updated information.  I have also
9    reviewed the articles cited by Dr. Zimnitzky in his
10   report.
11       Q   When you did a research to see if there
12   had been any updated articles, did you come up with
13   anything?
14       A   If I did, they'd be in there.  I don't
15   really recall specifically.  There meaning Exhibit
16   3.
17       Q   Tab 17 in your table of contents is
18   correspondence, slash, miscellaneous.  Is that
19   correspondence that you had with Mr. McCarron?
20       A   Yes.
21       Q   And what is the miscellaneous?
22       A   I think that had to do with correspondence

Page 27

1    I generated and a chronology dating back to my first
2    attempt at doing an evaluation in August 2012, some
3    affidavits, some e-mails.  Just to simplify things,
4    if you look at number 36, there's another folder on
5    correspondence.  Some of it's duplicative, but it's
6    all correspondence.
7        Q   May I please see 17?  Thank you.  Who
8    typed up the ▓▓▓▓▓▓▓▓▓▓▓▓ chronologies for August
9    13, 2012?
10       A   Who dictated them or who physically typed
11   them?
12       Q   Fair enough.  Did you dictate them?
13       A   I dictated them.  My typist typed them.
14       MS. PORWICK:  If I could have tab 17
15   marked as Exhibit 4, please.
16       (Spodak Exhibit 4 marked for
17   identification and attached to transcript.)
18   BY MS. PORWICK:
19       Q   Number 22 is the letters SGAH.  What does
20   that stand for?
21       A   Spring Grove Adventist Hospital.
22       Q   You mean Shady Grove Adventist Hospital?

Page 28

1        A   Shady Grove.  I'm sorry.
2        Q   That's okay.  Number 27 says depo notes.
3    Is that the notes that another witness compiled for
4    their deposition, or is that notes that you prepared
5    for your deposition?
6        A   Neither.  Those are notes that I made as I
7    reviewed the various depositions.
8        Q   Can you please pull 27?  Thank you.
9        MS. PORWICK:  I'd like to have that marked
10   as Exhibit 5.
11       (Spodak Exhibit 5 marked for
12   identification and attached to transcript.)
13   BY MS. PORWICK:
14       Q   Just so you know, Doctor, we'll make
15   copies of all of these and return the originals to
16   you.  What medical records and depositions and other
17   materials have you received since the time you
18   compiled the table of contents?
19       A   That ends at 39?
20       Q   Correct.
21       A   Here is through 45.  In addition to that I
22   haven't had a chance to add these to the table of

Page 29

1    contents, but I would also add the deposition of
2    Michelle Ann Vaca, the deposition of Johanna Dushek,
3    the deposition of Theresa Kurtz, Dr. Zimnitzky's
4    report and the articles that he cited in his report.
5        Q   Can you please pull 40, 41 and 45?  Thank
6    you.  We'll mark tab 40 as Exhibit 6, tab 41 will be
7    Exhibit 7, and tab 45 will be Exhibit 8.
8        (Spodak Exhibits 6, 7 and 8 marked for
9    identification and attached to transcript.)
10       A   One other thing that I was provided I
11   forgot to mention were the redacted notes from Ruth
12   Simon relating to the treatment of Brooke Farber.  I
13   don't think I mentioned those earlier.
14       Q   My guess is there's one or two notes from
15   the mom's breast cancer treatment included in that
16   packet.  Is that right?
17       A   Whatever is in the packet, yeah.  Some of
18   it appears to be from Brooke and from the mother.
19       MS. PORWICK:  The next thing I'm going to
20   have marked as Exhibit 9 is the timeline.  It is 14
21   pages.
22       (Spodak Exhibit 9 marked for

8 (Pages 26 to 29)

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 30

1   identification and attached to transcript.)
2   BY MS. PORWICK:
3        Q    Who prepared this timeline?
4        A    Excuse me?
5        Q    Who prepared this timeline?
6        A    I did.
7        Q    Did you dictate it, and then it was typed
8   by someone else, or did you type it?
9        A    Neither.
10       Q    How was it prepared?
11       A    It was prepared by my highlighting, and
12  the things I wanted to put on the timeline I would
13  turn up, put a clip on it, and my secretary would go
14  through and type them on the timeline based on what
15  I highlighted.
16       Q    Okay.  Was this timeline prepared prior to
17  your evaluation of ████████  LF
18       A    When you say prior to the evaluation, I
19  saw her on December 12th, so it was completed prior
20  to my either seeing her or certainly prior to doing
21  the report.
22       Q    I've reviewed the timeline, and it appears

Page 31

1   to me that it is compiled of only the medical
2   records.  Anything that occurred in a deposition is
3   not included in the timeline.  Is that right?
4        A    Not deposition, but I did have a separate
5   academic timeline for the school records.
6        Q    Exactly.  We're on the same page.  I'll
7   have that marked as Exhibit 10.
8            (Spodak Exhibit 10 marked for
9   identification and attached to transcript.)
10  BY MS. PORWICK:
11       Q    Just so I understand your note keeping,
12  the timeline is information that's contained in the
13  medical records, which is Exhibit 9, and the
14  academic timeline is information from the school
15  records, which is Exhibit 10, and then you kept
16  separate notes regarding your review of the
17  depositions.  Is that right?
18       A    Yes.
19       Q    Did Mr. McCarron provide you with any
20  research regarding selective mutism in this case?
21  By that, I mean any medical articles or texts.
22       A    His office provided me with the articles

Page 32

1   cited by Dr. Zimnitzky.  Other than that, no.
2        Q    In your forensic work are you able to
3   break down the percentage of time you testify on
4   behalf of the plaintiff versus the percentage of
5   time you testify on behalf of the defendant?
6        A    For testimony, probably the vast majority
7   is on behalf of the defense.
8        Q    What about just when you've been retained?
9   Is the percentage similar for cases in which you've
10  been retained even when you don't ultimately go on
11  to testify?
12       A    Over the years it's probably been 60,
13  maybe some years 70 percent weighted toward defense
14  and 30 to 40 percent weighted toward plaintiff, as
15  well as over the years I'm an independent examiner
16  for the Workers Compensation Commission, Department
17  of Labor, so I wouldn't count those for either
18  side.
19       Q    Nor would you count your criminal work
20  because that's not identified at plaintiff or
21  defendant.  Is that right?
22       A    Well, in my earlier years I did

Page 33

1   evaluations for the prosecution, but since I left
2   state service at Clifton Perkins Hospital they've
3   been almost exclusively for the defense.
4        Q    What do you currently charge per hour for
5   your forensic work?
6        A    500 per hour.
7        Q    Does that include review of materials as
8   well as evaluation time?
9        A    Yes.
10       Q    What about time giving testimony, is that
11  any different?
12       A    If it's in the general Baltimore area it's
13  the same.  If it's out of this area it's usually a
14  flat rate per day.
15       Q    And what is your flat rate per day?
16       A    5,000 dollars.
17       Q    Do you know how much money you made in
18  2012 from your forensic work?
19       A    Probably more recently as I'm getting
20  older I've cut back on time.  I'm probably doing
21  about 10 to 15 hours a week.  Back in 2012 it was
22  480 an hour, so whatever the math works out to for

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 34

1  that.
2      Q  Do you know what the fees that you've
3  generated to date in this case are?
4      A  I don't have a specific number, but
5  looking at the size of the case and the amount of
6  time I've spent, I would guesstimate somewhere
7  between 10 and 15,000 dollars.  I would point out
8  it's not that I've made.  It's that I've billed.
9      Q  Fair enough.
10     A  I don't get to keep it all with taxes and
11  all those things.
12     Q  It was a poorly worded question.  I
13  appreciate your fixing it.  In 2006 you filed a
14  lawsuit regarding disability insurance.  Is that
15  right?
16     A  Yes.
17     Q  What was the claim of the disability?  How
18  were you disabled?
19     A  With all due respect, I think I'm going to
20  decline to answer your questions unless I have a
21  personal attorney present.
22         MS. PORWICK:  Can you tell me what the

Page 35

1  time is on that?
2         THE REPORTER:  It is 12:11 P.M.
3  BY MS. PORWICK:
4      Q  Just so the record is clear, I have a
5  series of questions that I want to ask you regarding
6  your disability case.  Are you going to refuse to
7  answer them all unless there is a court order or
8  unless you have an attorney present?
9      A  Based on issues of medical privacy, yes.
10     Q  You are aware that the federal court in
11  the past has unsealed these records in light of the
12  fact that you work as a forensic expert and
13  determined that they aren't private, aren't you?
14     A  I'm aware that they've unsealed parts of
15  them, yes.
16     Q  And yet you're still unwilling to answer
17  questions regarding your disability case?
18     A  I'm asserting medical privacy to answer
19  questions about my personal medical history.
20     Q  Are you still currently receiving
21  disability benefits?
22     A  No.

Page 36

1      Q  At what point did you stop receiving
2  disability benefits?
3      A  In 2007, 2008 at the latest.
4      Q  And just to be clear, I'm going to ask the
5  questions that I want answers to, and if you're
6  going to decline to answer them, we may have to go
7  through a little rigmarole here so that I can get a
8  court order on some things I want some answers to.
9  You filed a lawsuit in 2006 against the Berkshire
10  Life Insurance Company and the Guardian Life
11  Insurance Company of America.  Is that right?
12     A  Yes.
13     Q  And in that case you alleged that you had
14  been disabled and that they had failed to pay the
15  proper monthly disability payments.  Is that right?
16         MR. MCCARRON:  If I could have a
17  continuing objection on this line of questioning.
18         MS. PORWICK:  Absolutely.
19     A  I filed a lawsuit about residual
20  disability, not disability.
21     Q  And in your lawsuit you made a claim that
22  you had suffered a cognitive impairment which

Page 37

1  rendered you disabled.  Is that right?
2      A  I'm going to decline to answer that about
3  my medical history.
4      Q  And that you had spent a period of time in
5  the hospital which precipitated your disability.  Is
6  that right?
7      A  Again I'm going to respectfully decline to
8  answer questions about my personal medical history.
9      Q  And in fact, in the complaint you yourself
10  categorized them as serious medical conditions and
11  problems, the onset of which was December 2nd, 2002.
12  Is that right?
13     A  All I would say is the records speak for
14  themselves, and I'm not going to provide personal
15  medical information.
16     Q  What was the outcome of this lawsuit?  You
17  filed for breach of contract.  Is that right?
18     A  Excuse me?
19     Q  You filed for breach of contract as the
20  basis for the lawsuit?
21     A  There was a confidential settlement.
22     Q  Did you give a deposition in association

MICHAEL K. SPODAK, M.D. — 4/23/2013

Page 38

1   with that case?
2       A   Yes.
3       Q   Did you undergo an IME in association with
4   that case?
5       A   I don't recall undergoing a defense IME,
6   no.
7       Q   Was the defense position in this case that
8   you in fact were not disabled and could work?
9       A   First of all, it related to residual
10  disability, not disability.  Again all I can say is
11  you'd have to ask the defense their position.  I'm
12  not a lawyer, but the records speak for themselves.
13      Q   As the plaintiff you didn't have an
14  understanding about what the defense's position
15  was?
16      A   If you're asking me what their position
17  was, I think you'd have to ask the defense.
18      Q   I'm asking you what your understanding of
19  their position was.
20      A   There was a contractual dispute.  Beyond
21  that it would get into a lot of legal issues that I
22  don't feel qualified as a physician to comment on.

Page 39

1       Q   The disability that you claimed commenced
2   on December 2nd, 2002, was it a cognitive
3   disability?
4       A   Again I will decline to answer that on the
5   basis of medical privacy.
6       Q   At the time period in which you are
7   claiming the disability and residual disability
8   benefits did you continue to provide forensic
9   psychiatry services?
10      A   Yes.
11      Q   At any point in time have you stopped
12  providing in your career clinical psychiatry
13  services?
14      A   Have I stopped?
15      Q   Has there ever been a period where you've
16  not provided those?
17      A   You mean other than when I was in the
18  hospital?
19      Q   At any point in time.
20      A   When I was hospitalized I didn't provide
21  clinical psychiatry services.
22      Q   For how long a period was that?

Page 40

1       A   Again I think I'll decline to answer that
2   on the basis of medical privacy.
3       Q   Did you talk with any person about this
4   case other than Dr. Richmond and Mr. McCarron or
5   someone from his office?
6       A   No.
7       Q   You sought the involvement of Dr. Lee
8   Richmond in this case.  Is that right?
9       A   Yes.
10      Q   Why?
11      A   Because I thought it might be beneficial
12  to my evaluation for her to do psychological testing
13  of Lindsey, and she does psychological testing of
14  children.
15      Q   Is that something that you do not do in
16  your professional practice, psychological testing of
17  children?
18      A   Yes.
19      Q   And what did you ask her to do?
20      A   I asked her to do a battery of
21  psychological tests and report to me on the
22  findings.

Page 41

1       Q   Did you specifically choose her?
2       A   Yes.
3       Q   Why?
4       A   Because I've worked with her for probably
5   20-plus years, I know her work, I'm confident of her
6   abilities, and she is capable of doing child
7   psychological evaluations.
8       Q   How many instances have you worked with
9   her on an occasion like this where you've asked her
10  to do an evaluation for you in conjunction with your
11  forensic work?
12      A   I would guesstimate going back to the
13  1980s there's probably been somewhere between 12 to
14  20, in that range.
15      Q   Have those all been children, or have you
16  asked for her assistance in cases which involved
17  adolescents or adults?
18      A   I can say no to adults.  I don't recall
19  whether some of the 12 to 20 were adolescents or
20  children, using the 12-year-old age as the cutoff.
21      Q   Did you personally call Dr. Richmond to
22  explain the case to her?

11 (Pages 38 to 41)

MICHAEL K. SPODAK, M.D. — 4/23/2013

Page 42

1   A  Probably not.
2   **Q  Who would have done that?**
3   A  That would have been someone in my front
4   office staff.
5   **Q  Did you ever speak with her prior to her**
6   **evaluation of** ▓▓▓▓▓▓▓▓
7   A  Probably.  It would be my standard
8   practice to do that to go over what I'd like her to
9   do.
10  **Q  And do you have a recollection of that**
11  **conversation?**
12  A  Not specifically.  If it was a standard
13  conversation, I would explain what my task was, to
14  do an evaluation, and ask her to do psychological
15  testing of the child, whatever tests she thought was
16  appropriate, and report on the findings.
17  **Q  Why did you want psychological testing on**
18  **Lindsey?  What was it about the presentation of this**
19  **case that made you think that you needed this as a**
20  **component to your forensic work?**
21  A  First I would regard psychological testing
22  as a fairly standard component to my forensic work.

Page 43

1   In adults I have a computerized test battery I
2   administer.  In children I typically ask
3   Dr. Richmond to do the evaluations.  If it's
4   neuropsychological issues or neurocognitive issues,
5   there's a neuropsychologist that I'm familiar with,
6   and I often ask him to do the evaluation.  I
7   consider psychological testing a fairly standard
8   component of a forensic psychiatric evaluation.
9   **Q  Who is the neuropsychologist that you**
10  **often work with?**
11  A  Usually I work with Dr. Arthur Horton,
12  H-o-r-t-o-n.
13  **Q  Is there any other psychologist you would**
14  **work with if Dr. Richmond wasn't available or wasn't**
15  **interested in participating in the case?**
16  A  That occasion hasn't come up yet.
17  **Q  Fair enough.**
18  A  If it did, I'd ask her for a referral to
19  somebody else probably.
20  **Q  She did her evaluation of** ▓▓▓▓▓▓
21  **first in terms of the chronology.  Is that right?**
22  A  I believe she did.  I'd actually have to

Page 44

1   look at the date when she did her evaluation.  I
2   believe she did it first.
3   **Q  I'll tell you that according to her**
4   **report, she actually did hers in September.  I'll**
5   **refresh your recollection.**
6   A  That would be after I obtained background
7   information from ▓▓▓▓▓▓ mother and before I saw
8   Lindsey.
9   **Q  Do you typically schedule them on the same**
10  **day?**
11  A  Typically schedule what?
12  **Q  Do you typically schedule the evaluations**
13  **that Dr. Richmond is going to perform and your**
14  **evaluation of the patient on the same day?**
15  A  I guess it varies depending on scheduling
16  issues, whether the child has to miss school or not,
17  whether they're coming from a different state.
18  There's a variety of factors that go into it.
19  Sometimes yes.  Sometimes no.
20  **Q  Do you find that it impacts your**
21  **evaluation when you are evaluating a child after**
22  **they've already undergone a battery of tests by a**

Page 45

1   psychologist?
2   A  Sure, it's possible depending on their
3   age.  That would be another reason not to do it on
4   the same day, so they don't get fatigued, things
5   like that.
6   **Q  What was the outcome of Dr. Richmond's**
7   **evaluation of** ▓▓▓▓▓▓▓ ?
8   A  It's outlined in her report.  Do you want
9   me to read the report?
10  **Q  What's your understanding of how she**
11  **evaluated her?**
12  A  Basically she tested normal for her age.
13  **Q  Is that what you expected?**
14  A  I didn't have any expectations.  That's
15  why I asked her to do the testing.  I would be
16  surprised I guess if she found something abnormal
17  because my read of the records up till certainly
18  2012 suggested that she was doing fairly well
19  overall.
20  **Q  Did you have a conversation with**
21  **Dr. Richmond about her evaluation of** ▓▓▓▓▓ **prior**
22  **to receiving her report?**

12 (Pages 42 to 45)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 46

1  A  Again my standard practice is to basically
2  ask her what she found.  That would be the extent of
3  it.  I don't recall specifically, but likely I would
4  have.  That would have been my standard practice.
5  Q  Does anything stick out about the
6  conversation that you had with Dr. Richmond in this
7  case?
8  A  Assuming I had one, no, nothing sticks
9  out.
10  Q  Is it typical when you're doing an
11  evaluation of a child to do an interview of one or
12  both of the parents?
13  A  Yes.
14  Q  Why?
15  A  Because I think it's important to provide
16  collateral information because, depending on the
17  child's age, especially when they're young, around
18  ███ age, they're not a very good historian for
19  anything meaningful.
20  Q  In your interview with ███████ mom did
21  you learn anything different from the records and
22  the materials that you had received?

Page 47

1  A  I don't know if I could sit here and tell
2  you what's different and what's the same without
3  going through page by page of the history.  I don't
4  think I learned anything substantively.  Actually I
5  did learn something very substantively different.  I
6  think there was a significant effort on ██████
7  mother's part to kind of minimize the severity of
8  ██████ problems predating the accident
9  particularly reflected in the notes I received most
10  recently from Ruth Simon, the redacted notes.
11  Q  And what did those redacted notes from
12  Ruth Simon tell you with regard to ██████
13  condition predating the accident?
14  A  Going back to the time frame of 2007 and 8
15  predating the accident, for example, on July 18th,
16  '07 ████████ described as out of control behavior,
17  pushes limits, ignores rules, parents give in, feel
18  powerless.  The note of sometime in '07 before June,
19  although it's not clear the exact date, there's a
20  notation that the mother had a reduced work
21  schedule.
22  Q  Before you leave that note let me ask a

Page 48

1  question.  The reduced work schedule of the mother,
2  does that indicate it's a result of ██████?
3  A  It doesn't say, but my recollection of the
4  information from Mrs. Farber was that she had a
5  reduced work schedule after the accident but not
6  before.
7  Q  Did you ask her whether she had a reduced
8  schedule before and then returned and then had a
9  reduced schedule again after?
10  A  That would be the standard history, but I
11  didn't have these notes at the time I evaluated her
12  to specifically ask her about what was in them.
13  Q  Did you have the notes from the employment
14  records from GW Hospital which indicated that the
15  mom had taken a short period of leave to care for
16  ██████ older sister Brooke?
17  A  I don't think I've been provided with any
18  personnel records on Mrs. Farber, so the answer
19  would be no.  The note from April 17th, 2008, which
20  is about a month before the accident, describes
21  ██████ as out of control, demanding, screaming and
22  scratching to get her way.  My recollection of

Page 49

1  Mrs. Farber's description of ██████ before the
2  accident basically was that she had a couple issues,
3  but she was really doing pretty well.  There's a
4  bunch of notes about ██████ being very mean to her
5  sister.  There's one in 2008 before the accident.
6  ██████ has been highly anxious and often
7  oppositional.  ██████ has been our high maintenance
8  child until the past two years when she has become
9  even more clingy, demanding, and occasionally
10  totally out of control with screaming, scratching,
11  kicking and hitting.  She is extremely attached to
12  her mother.  In January 2008 inability to control
13  ██████ refused setting limits.  Those are the
14  substance of what I learned from the records, and I
15  thought Mrs. Farber really markedly minimized
16  ██████ situation prior to the accident.
17  Q  In any of the records that you reviewed
18  regarding ██████ before the automobile collision
19  that's at issue in this case, was she diagnosed with
20  selective mutism?
21  A  No.
22  Q  In fact, you'd agree with me that upon

13  (Pages 46 to 49)

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 50

1 reviewing those records, it appears at least she was
2 verbal to the extent that she was oppositional, out
3 of control, and yelling at other members of her
4 family. Is that right?
5    A  I didn't really see any comments about her
6 being verbal, but I assumed that she was verbal
7 prior to the accident. There's one note -- the name
8 is redacted -- that says speech delay, but from the
9 context of other things I learned, I believe it was
10 her sister Brooke and not ▆▆▆, although the name
11 of the child was cut off on that notation.
12    Q  Right. But you'd agree with me that
13 that's a record that actually is regarding Brooke?
14    A  Well, most all of them are regarding
15 Brooke or the mother. ▆▆▆ was described, I
16 won't say tangentially, but through the other
17 individuals as best I could tell.
18    Q  Other than the mother's, in your words,
19 minimization of ▆▆▆ behavior prior to the
20 automobile collision, did you learn anything
21 different from her than what you had reviewed in the
22 records that was substantial or significant?

Page 51

1    A  I think the mother, if I recall my
2 notes -- you have them there --
3    Q  Please feel free to review them.
4    A  -- suggested that ▆▆▆ stopped talking
5 almost immediately after the accident. In my review
6 of the records it's a little vague, but at least two
7 weeks after the accident when she saw the
8 pediatrician she was verbal, and I think it appears
9 that sometime after that, around June, the beginning
10 of the summer, she stopped talking.
11    Q  How long was your interview with the mom?
12 I think it occurred on two different occasions. Is
13 that right?
14    A  Yes. No. The first occasion she got up
15 and walked out as we started talking. That was
16 confined to an assistant of mine taking background
17 history. The second occasion I would guesstimate
18 was somewhere between an hour to an hour and a half,
19 in that range.
20    Q  Tell me about the use of an assistant.
21 Was there an assistant who took background
22 information in that case?

Page 52

1    A  Yes.
2    Q  Who was that?
3    A  You have my notes.
4    Q  Which number do you want?
5    A  Let me look at the handwriting. That
6 would be number 40, Judy Harding, H-a-r-d-i-n-g.
7 She has a master's in science, does counseling on
8 her own, not through this office, and she's been
9 taking background histories for me for probably in
10 excess of 20 years.
11    Q  Is she an employee of your office,
12 Ms. Harding?
13    A  Excuse me?
14    Q  Ms. Harding, is she an employee of your
15 office?
16    A  No. She's a subcontractor.
17    Q  Why do you subcontract out someone else to
18 take the background and history?
19    A  Someone besides me you mean?
20    Q  Yes.
21    A  I find it more efficient. My experience
22 in doing forensic work at other settings, I found

Page 53

1 that it was valuable to have someone go through a
2 standard outline, do the history, and then doing my
3 own interview zeroing in on certain things. The
4 other is that Ms. Harding has the ability to type a
5 conversation speech, so I get almost a transcript of
6 what was said, which I find very helpful.
7    Q  When you say more efficient, does that
8 mean cost efficient?
9    A  I guess that's part of it. Primarily it's
10 that I just found it more complete to have someone
11 do the background history, and then I spend the
12 afternoon going into more specific things, and I
13 don't have to spend a lot of time on things that may
14 not be as germane to a particular case.
15    Q  Do you have the opportunity to review
16 Ms. Harding's notes prior to your evaluation with
17 the patient?
18    A  Yes.
19    Q  And did you in this case?
20    A  Yes.
21    Q  And do you have a copy of Ms. Harding's
22 notes?

14 (Pages 50 to 53)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 54

1    A   They're contained in section 40.
2    Q   Okay.  Thank you.
3    A   Exhibit 6.
4    Q   Does Ms. Harding follow a standard
5 outline, so to speak, for how she conducts the
6 background information?
7    A   Yes.
8    Q   And is that something that she developed
9 or you developed?
10    A   It's something I developed.
11    Q   And when she does that background
12 information in the case of a child evaluation, does
13 she get that from the child or the parent?
14    A   I'm sorry.  Once again.
15    Q   When Ms. Harding is doing that interview,
16 does she get the information from the child or the
17 parent?
18    A   Typically from the parent.
19    Q   What's the need for doing this if you've
20 already gotten, for example, in this case voluminous
21 medicals and school records and depositions?  What's
22 the purpose of an additional background by someone

Page 55

1 else?
2    A   I think it's important to do some of that
3 information gathering myself rather than rely on
4 other sources exclusively.  We also ask in the
5 standard background history questions that may not
6 be contained in the medical records, but I think
7 that's more applicable to adult evaluations than it
8 is specifically to children.
9    Q   If there is a conflict, for example, in
10 the information that was gained by Ms. Harding
11 versus information that was gained by the medical
12 records, do you attach more significance to one or
13 the other?
14    A   I don't do either.  What I try to do in my
15 interview is resolve any discrepancies by looking at
16 what the individual might have told Ms. Harding and
17 what is in the medical record and ask the person, if
18 there is something different, how to best reconcile
19 that.
20    Q   Is that one of her purposes, to try and
21 highlight discrepancies between what the parent is
22 explaining in terms of the history at the time she

Page 56

1 meets them versus what's contained in the medical
2 records?
3    A   I don't think it's an attempt to highlight
4 it.  I think it's an attempt simply to resolve it if
5 there is a discrepancy.
6    Q   Have you ever had an instance where there
7 wasn't a discrepancy?
8    A   Excuse me?
9    Q   Have you ever had an instance in all of
10 your years in doing this where there wasn't a
11 discrepancy?
12    A   I don't understand your question.
13    Q   Have you ever had an instance in which
14 Ms. Harding has done an interview, and there wasn't
15 a discrepancy in what Ms. Harding learned versus
16 what you learned in the medical records and school
17 records?
18    A   Sure.  It HAPPENS lots of times.  It's
19 also an issue of completeness.  A lot of times the
20 medical records have very brief notes about certain
21 things.  I like to get more expansive notes about
22 different areas that may not be in the depth that

Page 57

1 the medical records have.
2    Q   Was there any discrepancies in the
3 information that was compiled by Ms. Harding versus
4 the information that you learned in the other
5 materials that had been provided to you?
6    A   I think to the extent there was an attempt
7 at minimizing ▮▮▮▮▮ problems predating the
8 accident, I don't know if I'd call that a
9 discrepancy or just a minimization of it, but there
10 was certainly some discrepant issues with that.
11 Beyond that I wouldn't call it discrepancies as much
12 as I'd call it an attempt to get more detail than I
13 found contained in the medical records in a number
14 of areas.
15    Q   Did you think that Ms. Farber's
16 minimization, as you called it, of ▮▮▮▮▮▮▮ mental
17 health status prior to the accident was purposeful?
18    A   I don't know.  I guess I'd have to ask
19 Ms. Farber that.
20    Q   You'd agree with me that a lot of times as
21 time passes what we remember occurring and what
22 actually occurred differs not because of any

15 (Pages 54 to 57)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 58

1  purposeful attempt to try and change history but
2  because you just don't remember how it happened when
3  it happened three years ago?
4      A   That is certainly a possibility.  I've
5  often found people do what's called false
6  attribution and deliberate minimization.  In all
7  fairness to this case, I was not evaluating the
8  mother, I was gaining information from her, so I did
9  not attempt to do a psychiatric evaluation of her to
10  determine her motives.
11     Q   So you're not going to testify whether you
12  found what you're categorizing as her minimization
13  to be purposeful or not?
14     A   I don't think I would be able to do that.
15  I certainly can testify that I found definite
16  minimization, but ascribing a specific purpose to
17  it, as I say, it wasn't my charge to do an
18  evaluation of the mother.
19     Q   How long was your actual evaluation of
20  Lindsey in this case?
21     A   The evaluation was extremely long.  The
22  interview you mean?

Page 59

1      Q   Fair enough.  The interview, yeah.
2      A   The interview was fairly brief, in the
3  range of 20 to 30 minutes.
4      Q   Is that typical in terms of the past
5  evaluations that you've done of children that the
6  interview is in the 20 to 30 minute range?
7      A   Children of her age, yes, that's not at
8  all unusual.  I don't expect to find a lot of
9  substantive information.  I'm mostly looking to try
10  to get a sense of how they're doing now.  Trying to
11  find historical information from a five or
12  six-year-old is not very productive.  I also found
13  that I thought _____ was, I don't know how
14  forthcoming she would have been if her mother wasn't
15  present, but her mother was sitting in the room as
16  an observer, and that was a factor that is not
17  something I have commonly had because most of the
18  cases I've had the opportunity to see the child
19  without the mother present.
20     Q   Is that because most of the cases you're
21  doing is custody cases, so you're trying to evaluate
22  the child?

Page 60

1      A   Custody or trauma cases.
2      Q   So you've never had a trauma case in which
3  the child who is of tender years age as _____ was
4  wanting to have their parent present during an
5  interview?
6      A   Yeah, I think they've wanted to have them
7  present.  I've usually had the mother sit out in the
8  waiting room.  Sometimes a child gets a little
9  upset, they go out and talk to the mother, they come
10  back in, any variety of things.  There may have been
11  one or two occasions in the past where there was a
12  court order requiring the mother to be present.
13     Q   And that was the case in this instance as
14  well.  Is that right?
15     A   Yes.
16     Q   Did _____ mom coach her during your
17  interview with _____?
18     A   I don't think so, no.  I didn't observe
19  her coaching her.
20     Q   She was simply there for emotional comfort
21  if _____ needed it?
22     A   She was there because she was

Page 61

1  court-ordered to be there.  I can't tell you why.
2      Q   But _____ wanted her there, right?
3      A   I don't know if _____ wanted her there.
4  I didn't attempt to interview her without her there.
5      Q   You did attempt to interview her in the
6  summer of 2012 without her mom, and she said she
7  wasn't going to do it.  Is that right?
8      A   First of all, I did not attempt to
9  interview her in the summer.  I interviewed the
10  mother, and she said she was not going to permit
11  _____ to be interviewed without her being present.
12  That was what the mother said.  I have no idea what
13  _____ said because I never got to talk to her.
14     Q   So you didn't talk to _____ at all in
15  the summer of 2012?
16     A   I don't recall, except saying hello or
17  something, speaking to _____ in August of 2012,
18  no.
19     Q   Okay.
20     A   It's outlined in the chronology, but it's
21  my recollection it was the mother's insistence.  We
22  never got as far as whether _____ wanted her

16 (Pages 58 to 61)

MICHAEL K. SPODAK, M.D. — 4/23/2013

Page 62

1   mother present or not.  I note on this that
2   Mrs. Farber insisted on being present when
3   Dr. Richmond saw ~~_____~~ but I did not see
4   that day in any attempt of an interview.
5       Q   Would you agree with me that a car
6   accident can be a traumatic experience?
7       A   Excuse me?
8       Q   A car accident can be a traumatic
9   experience?
10      A   Yes.
11      Q   And whether it's a traumatic experience or
12  not is multifactorial.  It depends, for example,
13  on --
14      A   Can you speak up a little bit?
15      Q   Yeah.  Can you hear me better?
16      A   Yes, that's better.
17      Q   Whether a car accident is traumatic is
18  multifactorial.  Is that right?
19      A   I'm not sure I understand your question.
20      Q   Sure.  It depends, for example, on the
21  impact of the automobile collision?
22      A   That would be one factor.

Page 63

1       Q   And it may depend on whether a person was
2   physically injured?
3       A   Whether?
4       Q   Whether a person was physically injured?
5       A   Yes.
6       Q   And it could depend on whether there were
7   other people that were physically injured or killed
8   in the automobile collision?
9       A   Sure.
10      Q   And it could depend on the person's
11  emotional state at the time of the collision,
12  meaning not because of the collision but up to and
13  during the time of the collision?
14      A   That could be a factor.
15      Q   And in your clinical practice have you
16  treated patients who have mental health needs
17  because of a traumatic experience following an
18  automobile collision?
19      A   Yes.
20      Q   Have you treated a person that has had an
21  exacerbation of anxiety symptoms, meaning they had a
22  preexisting condition of anxiety, and an automobile

Page 64

1   collision exacerbated those symptoms?
2       A   I don't know if the automobile accident
3   specifically exacerbated the symptoms, but I have
4   certainly treated people who got worse after an
5   automobile accident.  Again temporally there was an
6   association.  I've also treated people with
7   posttraumatic stress disorder following automobile
8   accidents.  So yes, it certainly does happen.
9       Q   You seem hesitant to suggest or to agree
10  that an automobile collision can cause an increase
11  in anxiety?
12      A   Can cause an increase in anxiety?  It's
13  possible.
14      Q   And as you said, you've treated patients
15  with posttraumatic stress disorder following an
16  automobile collision?
17      A   Yes.
18      Q   But none of those have been children in
19  your clinical practice?
20      A   That's correct.
21      Q   Have you done any literature search
22  regarding children's responses to traumatic

Page 65

1   automobile collisions?
2       A   It's contained in some of the literature I
3   looked at on selective mutism, yes.
4       Q   Did you do an independent literature
5   search regarding children's responses to traumatic
6   automobile collisions?
7       A   Independent of selective mutism you mean?
8       Q   Yeah.
9       A   Well, some of that I notice was contained
10  in at least one or two articles of Dr. Zimnitzky's,
11  but I don't recall specifically doing a literature
12  search on that topic.
13      Q   In your understanding what are the causes
14  generally of selective mutism?
15      A   My understanding is that there is no
16  agreed upon etiology of selective mutism.  All the
17  articles I've read said there really is no
18  established cause or etiology.
19      Q   And the articles that you're referencing
20  are the ones that you have pulled in your tab 16,
21  which is Exhibit 3, and the ones that were
22  referenced by Dr. Zimnitzky.  Is that right?

17 (Pages 62 to 65)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 66

1    A  Yes.
2    Q  Are you aware that the literature
3  regarding the etiology of selective mutism suggests
4  that the cause may be multifactorial?
5    A  The cause has been considered to be
6  multifactorial, although trauma has been ruled out
7  as a cause in most of the literature I reviewed.
8    Q  In most of the literature or in all of the
9  literature?
10    A  Excuse me?
11    Q  In most of the literature or in all of the
12  literature?
13    A  I don't know that I've reviewed all the
14  literature that's out there.  All the literature
15  I've reviewed and those that reference other
16  literature studies have essentially ruled out trauma
17  as a cause of selective mutism.
18    Q  Isn't it more accurate to say that they
19  have categorized it as an uncommon cause but not
20  that it's not a cause?
21    A  No.  Most of them have actually, as best I
22  can rule, simply said that there is no established

Page 67

1  etiology.  If there's no established etiology, then
2  trauma is not a cause.
3    Q  If there's no established etiology, then
4  there in fact is nothing that's considered a cause
5  of selective mutism.  It just, poof, happens, right?
6    A  It doesn't mean it, poof, happens.  It
7  just means that the scientific evidence we have to
8  date has not established a cause by any consensus or
9  peer-reviewed literature.  I'm sure there may
10  possibly be a cause found one day, but it's not the
11  state of the current psychiatric or child psychiatry
12  literature or anything that I've seen on selective
13  mutism.
14    Q  Isn't it more accurate to say that they
15  haven't established one cause of selective mutism,
16  but they in fact have established a bevy of
17  alternatives that may be a cause, all of which
18  they're still investigating as to how they play a
19  part in the diagnosis of selective mutism?
20      MR. MCCARRON:  Objection to form.
21    A  The best I've been able to glean from the
22  literature is that the only cause they seem to

Page 68

1  mention is genetic.  Other than that, there's no
2  etiology that has been identified as a cause of
3  selective mutism.
4    Q  I want to make sure I'm clear.  The
5  research that you've done that you're relying on is
6  what's contained in tab 16?
7    A  As well as confirmed by the literature
8  cited by Dr. Zimnitzky.
9    Q  Is there a cause of autism?
10    A  Excuse me?
11    Q  Is there an accepted cause of autism?
12    A  I'm not aware of any specific cause, no.
13    Q  Is there cause of anxiety?
14    A  There's a physiologic cause if you're
15  talking about physiologic mechanisms.  I don't think
16  there's any absent PTSD, which is identified as a
17  specific event in time that has certain well-defined
18  parameters.  There are associations.  People tend to
19  get anxious after certain traumatic events or life
20  experiences, but as far as what actually causes
21  anxiety, no, I don't think there's any agreed upon
22  etiology to that either.

Page 69

1    Q  Then you'd agree with me that a person can
2  suffer from anxiety without having the diagnosis of
3  PTSD?
4    A  Yes.
5    Q  And in fact, if a person is suffering from
6  anxiety, and they don't meet the qualifications of
7  PTSD, they actually under the DSM go under
8  generalized anxiety?
9    A  They can fall under a variety of different
10  diagnoses.  That's one of them of.
11    Q  In your review of the literature did you
12  find any peer-reviewed articles that discussed
13  children that developed selective mutism following a
14  traumatic event in their life?
15    A  I believe there was one cited by
16  Dr. Zimnitzky which had to do with a single case
17  report following a dog bite trauma that he
18  referenced.  The article he cited that reviewed
19  selective mutism after automobile accidents, the
20  entire population are all children who were
21  hospitalized.  I think that's a different cohort
22  than Lindsey's case because some of them were in

18 (Pages 66 to 69)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 70

1  hypovolemic shock, and they were seriously
2  physically injured and had gone through the
3  experience of a hospitalization which you don't have
4  in this case. So I don't think that article really
5  can be applicable to this case.
6      Q   In your research have you come across any
7  case reports of people that had selective mutism
8  following sexual abuse?
9      A   That's been thought to be a cause, but a
10 number of these articles seem to discount that and
11 don't use that as a cause, but some of them use it
12 as an association.
13     Q   In your review of the literature did you
14 find any reports of children that developed
15 selective mutism following physical abuse?
16     A   Again they may have following physical
17 abuse, but there's no articles I saw that indicated
18 that there's a cause of it or an established
19 etiology to say that physical abuse is a cause of it
20 or sexual abuse is a cause of it or whatever because
21 the prevailing opinion is we do not know the
22 etiology if there is one.

Page 71

1      Q   Don't those articles actually suggest that
2  the traumatic events of, for example, sexual abuse
3  or physical abuse are a multifactorial piece of the
4  cause of selective mutism, that they in and of
5  themselves may not be the sole cause of the
6  selective mutism?
7      A   First of all, those articles use the term
8  associated, meaning that they take a cohort of
9  people with selective mutism and look in the
10 background of what common factors they have, but an
11 association is not causation.
12     Q   What is an association to you?
13     A   Excuse me?
14     Q   What does association mean to you?
15     A   Association is merely meaning that
16 something was identified before an event, but it
17 doesn't necessarily mean it is the cause of the
18 event. For example, children with larger shoe sizes
19 tend to be much better spellers. That doesn't mean
20 the size of your foot means that you're a better
21 speller. What it means is that children with larger
22 shoe sizes tend to be older, and as they get older

Page 72

1  they tend to be better spellers. So there's no
2  causation between foot size and spelling. It's an
3  association.
4      Q   For an injury to be caused by an
5  automobile collision, doesn't it need to be
6  exclusively caused by the automobile collision?
7          MR. MCCARRON: Object to form.
8      A   For an injury to be caused by an
9  automobile accident. Do you mean a physical injury
10 or an emotional injury? I'm not sure I understand
11 your question.
12     Q   Either. For a person to have an injury
13 after an automobile collision, does the injury need
14 to be exclusively caused by the automobile collision
15 for it to be a cause of the automobile collision?
16     A   I guess it depends. Are you asking as a
17 forensic matter, or are you asking as a general
18 clinical matter? As a forensic matter, if you're
19 establishing cause there are certain legal terms
20 that apply to it. If you're talking clinically that
21 someone says I was in an accident, now I feel worse,
22 I'd like some treatment, you don't necessarily go

Page 73

1  back and do, as I indicated earlier, a detailed
2  analysis of whether the accident was the specific
3  cause. If they say it is for clinical purposes, you
4  tend to take it at face value and treat them for the
5  symptoms. If you're looking for specific forensic
6  opinions in a legal setting, I think you have to go
7  beyond that and look at whether it is a cause, some
8  cause, no cause, if there's the ability to identify
9  a cause. I don't know how to better answer that
10 question.
11     Q   In your forensic work, for an injury to be
12 a cause of the automobile collision, what does that
13 mean?
14         MR. MCCARRON: I'll object.
15     A   I don't know that it means anything
16 because I'm not sure what you're defining by injury,
17 whether you're talking about physical, emotional,
18 how serious. For example, if someone is in a car
19 accident and suffers a broken arm, I think it's fair
20 to say that if their arm hit the side of the car as
21 the car was in a collision, then yes, the auto
22 accident and striking their arm was the cause of the

19 (Pages 70 to 73)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 74

1 physical injury. I think that would be a fairly
2 clear example of that.
3    Q   And using that example, what if the person
4 had a fractured arm at the time that they were in
5 the automobile collision?
6    A   Well, you'd have to know did they fracture
7 it right before the accident because they had a slip
8 and fall, or was their arm perfectly normal at the
9 time of the accident, and they suffered an injury to
10 the arm that wasn't present before?
11    Q   You'd agree with me under that scenario of
12 course, which is not present here, that the
13 automobile collision could have caused the broken
14 arm, or it could have exacerbated a preexisting
15 condition that already existed in the arm prior to
16 the automobile collision?
17    A   If you have the history that they struck
18 their arm against the side of the car, and they have
19 bruising and physical pain and an x-ray that shows a
20 fracture right where they say they struck their arm,
21 I would say that's fairly good evidence that the
22 auto accident caused the broken arm.

Page 75

1    Q   Let's talk about it in the context of an
2 emotional injury where you don't have bruising
3 that's noticeable, and you don't have the ability to
4 take an x-ray. Would you agree with me that an
5 automobile collision can cause an exacerbation of an
6 emotional condition?
7    A   It really depends on the condition, and it
8 depends on the nature of the accident. Are you
9 asking a clinical cause, or are you asking for legal
10 testifying purposes? Because for that I think we've
11 talked about that there's no literature that
12 establishes an etiology. For purposes of clinical
13 treatment you can use that as a potential cause, but
14 if you're trying to establish some legal testimony
15 that meets a standard of peer-reviewed literature,
16 general acceptance, et cetera, then you have to go
17 much beyond that, and it really depends on what
18 condition you're talking about. If you're talking
19 about PTSD, yes, there's established literature that
20 says that traumatic events can cause PTSD. There's
21 not such a thing with generalized anxiety or with
22 selective mutism to the best of my knowledge. It's

Page 76

1 1:00 o'clock. I gather we're going to be here
2 awhile.
3    Q   Yes, we are.
4    A   Maybe we could take a little break. I
5 don't know if anybody wants to do lunch or just take
6 a five-minute break or whatever. I certainly want
7 to take a little break.
8    Q   I'm happy to accommodate you, whatever you
9 prefer.
10    A   I'll go with the little break now.
11       (Recess 1:02 P.M. to 1:27 P.M.)
12 BY MS. PORWICK:
13    Q   Are you ready, Doctor?
14    A   Yes.
15    Q   All right. How many case reports of a
16 person developing selective mutism following a
17 traumatic event would you need to see in a
18 peer-reviewed context to consider it a potential
19 cause of selective mutism?
20    A   I would need research which says there is
21 an etiologic connection. That's not the state of
22 the literature right now, nor the state of the

Page 77

1 community knowledge about the topic.
2    Q   I understand that you would need research.
3 How much is my question. What do you need? What
4 would be sufficient for you?
5    A   I don't know. I'd at least like to see
6 one article. That's not sufficient. The general
7 standard is there has to be a community acceptance,
8 and there has to be peer-reviewed literature. I
9 don't know that there's a defined number of
10 peer-reviewed literature studies, but there
11 generally has to be acceptance that they found a
12 cause of a particular condition.
13    Q   Do you happen to have a copy of your
14 report available?
15    A   Yes.
16    Q   All right. I'm looking at page 2. The
17 first and second paragraphs are in quotations. Was
18 this information that was collected by Ms. Harding?
19    A   No. This was from my interview asking the
20 mother what she thought was still going on.
21    Q   And the pre-accident history, this is
22 again information that you gathered from the mother

Merrill LAD

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 78

1  during your interviews of her?
2     A   Yes.
3     Q   The information that's contained in the
4  accident, this is information again that you got
5  from the mother or the mother and records?
6     A   Everything I've noted in the report on
7  pages 1 through the top of 6, the first paragraph,
8  came from the mother.  The lower part of 6 is a
9  summary of my interview with ~~████~~ *LF*
10     Q   Let's go there.  Tell me about your
11  interview with ~~████~~ *LF*
12     A   It's on page 6.
13     Q   Was she communicative with you?
14     A   Excuse me?
15     Q   Was she communicative with you?  Did she
16  talk with you?
17     A   Do you want me to read from the report?
18     Q   No.
19     A   That's the best I'm going to be able to do
20  is read it from the report.
21     Q   Based on your recollection did she talk
22  with you?

Page 79

1     A   She talked with me some.  She was
2  reluctant to speak at first.  As the interview
3  progressed she became more engaging and talkative.
4  She was somewhat selective in the things that she
5  chose to talk about.  She spoke about the accident
6  but not about any selective factors in her mutism.
7  When speaking responses were coherent, relevant and
8  goal-directed.  Her vocabulary was consistent with
9  her education and background.
10     Q   Do you have an independent recollection of
11  the interview with ~~████~~ *LF*
12     A   Yeah, I have a vague recollection.  I
13  won't say vague.  I have a recollection of it, yes.
14     Q   What questions did you ask her about the
15  accident?
16     A   I don't recall specifically.  I probably
17  asked her what she remembered about it if anything.
18  Beyond that I can only comment on what's in the
19  report.  You have my notes.
20     Q   Sure.
21     A   I think you were provided with a copy of
22  the interview notes, right?

Page 80

1     Q   I was not, no.
2     A   If you make a copy of it, the top of page
3  8 is a summary or actually close to a transcript of
4  what the conversation with Lindsey was about from
5  page 8 through, looks like 10.
6     Q   Was there someone in the room that was
7  transcribing the conversation that you had with
8  ~~████~~ *LF*
9     A   Excuse me?
10     Q   Was there someone in the room that was
11  transcribing the conversation that you were having
12  with ~~████~~ *LF*
13     A   Yes.  No.  I'm sorry.  The interview
14  lasted from 3:45 to 4:20.  As I recall, the mother
15  was present, but I don't think it was transcribed as
16  best I'm remembering.  It's in my notes, the last
17  one, two, three pages of notes.
18     Q   And on there does it indicate what
19  questions you asked her about the automobile
20  collision?
21     A   She said black glass shattered on CeeCee.
22  She got frightened.  CeeCee to the hospital.  That's

Page 81

1  basically what she said about the accident.
2     Q   Did she tell you that it made her scared?
3     A   Excuse me?
4     Q   Did she tell you that she was scared after
5  the automobile collision, that she cried?
6     A   She said she got frightened.
7     Q   Did she tell you that she talked about the
8  automobile collision incessantly for the first few
9  days after the collision?
10     A   Did ~~████~~ tell me that?  No.
11     Q   Did you ask her any questions about it?
12     A   I asked her a lot of questions about it,
13  but she wasn't very communicative about it.
14     Q   Did you assign any significance to the
15  fact that she was not communicative about the
16  automobile collision?
17     A   I attached a lot of significance to a lot
18  of things, mostly that had she had the accident and
19  gone into a little bit of emotional distress, and
20  there had not been a lawsuit filed, she probably
21  would have gotten over it by the summer of 2008,
22  maybe the fall.  Since there's been a total

21  (Pages 78 to 81)

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 82

1  preoccupation by the mother, the child, she's been
2  to all these different therapists, she's been to
3  evaluations, she's constantly having to relive the
4  story, it's like pulling a scab off and not letting
5  the underlying skin heal.  So yeah, I think that's a
6  big factor in why she's still talking about it.
7      Q   Can you state that to a reasonable degree
8  of medical certainty?
9      A   Sure.
10     Q   Did you ask her about any other topics for
11 which she chose not to talk to you about?
12     A   Yeah.  She spoke about the accident.  I
13 asked her a bunch of things about what circumstances
14 she didn't talk and why and what that was about, and
15 she didn't want to stay very much as noted in the
16 report.  She spoke about the accident but not about
17 any selective factors in her mutism, which I don't
18 want to say is contrived, but as I say, I think it's
19 a focus of things because when you count up the
20 number of evaluations she's had between depositions
21 and evaluations and focusing on this accident, it
22 keeps bringing it up to mind.  We talked a little

Page 83

1  about her school, her pet dog, about Brooke.
2      Q   Did she answer those questions that you
3  had about those topics, Brooke and her pet dog and
4  school?
5      A   Somewhat.
6      Q   So the areas in which she was not
7  answering your questions as fully as you would have
8  liked dealt with her selective mutism and the
9  automobile collision?
10     A   I don't know if it was selective mutism.
11 She just didn't want to answer questions in much
12 detail.  Plus her mother was sitting there.
13     Q   I'm not asking whether it's selective
14 mutism.  I said the areas in which she did not
15 expand, the areas in which she did not answer all of
16 your questions, were those questions about selective
17 mutism and questions about the automobile
18 collision?
19     A   There's a lot of things she didn't expand
20 on, but I don't expect a child of her age to be very
21 expansive.
22     Q   That's my question.  What other areas was

Page 84

1  she not expanding on?
2      A   Everything.
3      Q   What questions did she not talk about?
4      A   Everything.  How is school?  It's okay.
5  She's not expansive, but you don't expect that from
6  a ten-year-old.
7      Q   Would you have expected her to have
8  recalled more details about the accident than she
9  did?
10     A   I would have expected her to recall fewer
11 details about the accident had there not been this
12 ongoing litigation process which constantly causes
13 her to be reminded of it and asked about it.
14     Q   So the fact that she developed selective
15 mutism and had emotional problems following the
16 automobile collision is because she filed a lawsuit
17 about it?
18     A   No, I didn't say that.  There's no
19 established etiology for selective mutism.  While
20 you can't ascribe trauma to it, I don't think
21 there's any known etiology for it to ascribe any
22 other cause to it as well.

Page 85

1      Q   I understand that you have an opinion that
2  selective mutism was not caused by the automobile
3  collision.  My question is different.  Do you have
4  an opinion about what in fact was the affirmative
5  cause of selective mutism?
6      A   I think I said a few times there is no
7  established etiology or cause for selective mutism.
8  Given that, I am not in a position to opine about a
9  cause because there's no known cause for it.
10     Q   Would you be able to say that the
11 automobile collision was a contributing factor to
12 her selective mutism?
13     A   I have not seen any literature,
14 peer-reviewed or otherwise, or community acceptance,
15 which suggests that a traumatic automobile accident
16 is a contributing factor to selective mutism.
17     Q   Would you agree with me that there's
18 literature out there that suggests that traumatic
19 events in and of themselves, not specifically an
20 automobile collision but a traumatic event, can be a
21 contributing factor to the development of selective
22 mutism?

22  (Pages 82 to 85)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 86

1  A   Once again there's been no established
2  etiology for selective mutism.  If there's no
3  etiology, there's no established literature on what
4  is a contributing event to the extent that it is a
5  cause of something.
6  Q   Would you agree with me that Lindsey
7  Farber met the diagnostic criteria for selective
8  mutism in the summer of 2008 after the automobile
9  collision?
10  A   The latter part of the summer, early fall,
11  yes.
12  Q   And in fact, she was diagnosed with
13  selective mutism in the summer of 2008 after the
14  automobile collision?
15  A   Yes, she was.  I don't dispute that.
16  Q   And you'd agree with me that she had not
17  been diagnosed with selective mutism prior to the
18  automobile collision in May of 2008?
19  A   As you asked that question before, the
20  answer is no.
21  Q   No, she had not?
22  A   She was not, correct.

Page 87

1  Q   And in your interview with the mother and
2  review of the medical records and all the other
3  materials in this case, what other if any
4  significant events occurred in _____'s life in the
5  spring and summer of 2008?
6  A   There were ongoing events with family
7  discord, issues with her sister.  As I referenced
8  earlier from the records, her throwing temper
9  tantrums and rather uncontrolled behavior was an
10  ongoing problem.
11  Q   During that ongoing problem she still was
12  communicative and did not exhibit the signs of
13  selective mutism prior to the time of her diagnosis
14  in July of 2008.  Is that right?
15  A   As I've said, I found no indication that
16  she was diagnosed with selective mutism prior to the
17  summer of 2008.
18  Q   My question now is a little different.
19  Not that she was diagnosed but that she exhibited
20  the signs and symptoms of selective mutism prior to
21  the summer of 2008.  Did you find any evidence of
22  that?

Page 88

1  A   I did not see evidence that she was
2  selectively mute even without the diagnosis prior to
3  the summer of 2008.
4  Q   Do you think it's a coincidence that the
5  automobile collision occurred in May of 2008 and
6  _____ became selectively mute shortly
7  thereafter?
8  A   I have no idea because there's no
9  established etiology for the cause of selective
10  mutism.  Whether it was a coincidence or a nonevent,
11  I don't know, but there's no established etiology
12  for selective mutism.
13  Q   Would you agree with me that _____ had,
14  if not an official diagnosis, had the signs and
15  symptoms of anxiety prior to the automobile
16  collision in 2008?
17  A   Actually from my review of the records, it
18  appears that she had far more symptoms of anxiety,
19  temper tantrums and disruption prior to the accident
20  than she did after the accident.
21  Q   When was the first time that there was
22  report to the Farber family of _____ showing signs

Page 89

1  and symptoms of selective mutism?
2  A   When was the first time?
3  Q   Yeah.
4  A   As I said earlier, as far as I know, when
5  she saw her pediatrician on May 28th, I believe it
6  was, of 2008, she did not have any symptoms of it.
7  It was sometime after that, within the next few
8  weeks or so according to the medical records.
9  According to the mother it apparently happened right
10  after the accident, but that seems disputed by the
11  medical records.
12  Q   Actually if you look at your report on
13  page 3, Mrs. Farber stated that _____ speaking
14  started to decline within two weeks after the
15  accident.
16  A   She said within two weeks, but again I saw
17  a medical record two weeks after the accident which
18  didn't indicate any complaint of a decline by the
19  mother or any observation of a decline in speaking
20  by the doctor.
21  Q   Did the mom explain to you that it was a
22  flip of a switch, that one day she was talking, and

23 (Pages 86 to 89)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 90

1  the next day she wasn't, or that it was a gradual
2  decline?
3     A  No. I think he said it was gradual.
4     Q  And the doctor's appointment that you're
5  referencing on May 28th, 2008, that was the
6  pediatrician that she had regularly seen throughout
7  her young life. Is that right?
8     A  Yes.
9     Q  Did you subscribe any significance to the
10  preschool teacher's report that at some point after
11  the automobile collision, ▉▉▉▉▉ stopped actively
12  participating in preschool?
13     A  Sure. In my report I indicated that in my
14  opinion she had selective mutism, which developed
15  sometime after the accident, and she got over it a
16  couple years later, and she's better from it.
17     Q  In the content category on page 6 of your
18  report, the content was generally response and
19  age-appropriate. What does that mean, generally
20  response?
21     A  I'm sorry. That's a misprint. It should
22  say the content was generally responsive, which

Page 91

1  means if I asked a particular question, if she
2  answered, it was responsive to the content of the
3  question.
4     Q  So, for example, if you asked her what
5  color her shirt was, she gave you a color as an
6  answer? She was responsive? She was giving you
7  information that was responsive to your question?
8     A  Correct. That was a misprint.
9     Q  Okay. At times she was guarded and vague.
10  How was she guarded and vague?
11     A  She didn't talk very much about stuff.
12     Q  And the stuff she didn't talk very much
13  about was the automobile collision and her not
14  speaking in certain public scenarios. Is that
15  right?
16        MR. MCCARRON: Objection.
17     A  Again she was generally defensive and
18  resistive about a lot of things, but I didn't think
19  exceptionally so. You don't expect children at age
20  ten to be terribly expansive, but she seemed a
21  little more reticent to speak than my experience
22  with a lot of other children that I've evaluated.

Page 92

1     Q  In what areas was she reticent to speak
2  other than the automobile collision and her
3  selective mutism?
4     A  Actually she spoke about the automobile
5  collision in more detail than she spoke about
6  anything else.
7     Q  Okay. What areas was she reticent to
8  speak in?
9     A  Everything else.
10     Q  What other areas did you inquire about?
11     A  How are things at home? How are things
12  with your mother? How are things with your sister?
13  How are things in school? She wasn't very detailed
14  at all about are there any other stressors going on,
15  anything upsetting you in your life. She would
16  either shrug or give very vague and guarded
17  answers.
18     Q  In your experience for a child of
19  ▉▉▉▉▉'s age, are they typically able to give you
20  meaningful responses to those questions?
21     A  As I said, I thought she was somewhat
22  defensive and resistant but not excessively so, so I

Page 93

1  wouldn't put it outside the bell curve, but it was
2  certainly on the side toward being less responsive
3  and expressive than most, but I don't think it was
4  outside the curve of being exceedingly unusual.
5     Q  Was your evaluation of ▉▉▉▉▉ consistent
6  with the report and findings of Dr. Richmond?
7     A  Excuse me?
8     Q  Was your evaluation of ▉▉▉▉▉ consistent
9  with the findings and report of Dr. Richmond?
10     A  Yes. I didn't think there was anything
11  particularly notable about her in terms of
12  pathology. The other thing I'd add is when you
13  speak to a ten-year-old, I'm a stranger speaking to
14  her for the first time. You don't expect them to be
15  responsive. The ideal situation would be if you
16  could see them a couple of times and establish some
17  rapport and maybe have them be a bit more
18  communicative, but it's the nature of the type of
19  evaluation you do, and you have to accept it in that
20  context, and that's what I do.
21     Q  In the depositions of some of ▉▉▉▉▉
22  healthcare providers, they attributed the automobile

24 (Pages 90 to 93)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 94

1  collision to be a cause or contributing factor to
2  her selective mutism. Did you see that?
3      A  Some of them did. Some of them didn't
4  know. I thought for the most part the prevailing
5  opinion was they had no opinion about cause.
6      Q  Okay. You read Dr. DiFazio's deposition
7  where he said that it was a cause or contributing
8  factor?
9      A  I didn't see that they were quizzed about
10  the nature of the literature. You say oh, the
11  accident happened, and a couple weeks later she
12  stopped talking. Gee, it must have been a cause.
13  When you look at the specifics of it, the review of
14  the literature, studies of it and so on, there's no
15  established etiology, and trauma has been
16  essentially ruled out as a cause of selective
17  mutism.
18      Q  And you read Ruth Simon's deposition where
19  she testified that she thought it was a cause or
20  contributing factor?
21      A  I don't recall specifically, but I do
22  recall most of the people's depositions I read, when

Page 95

1  they were pinned down, really weren't able to say
2  that it was a cause.
3      Q  And you read Dr. Kurtz's deposition where
4  she said it was a cause or contributing factor. Is
5  that right?
6      A  It's possible. Again they didn't seem to
7  be quoting the peer-reviewed literature and the
8  established community accepted opinion about it.
9  They just seemed to be saying yeah, it seemed like a
10  cause because it happened afterward.
11      Q  What's the obligation of a doctor to
12  report cases when they see a patient in a clinical
13  setting to provide a case report on their patient
14  and the cause of any illness or disease in the
15  patient?
16      A  What's that?
17      Q  Do they have any obligation?
18      A  I don't know what you mean. I don't think
19  there's any specific obligation, but post hoc does
20  not equal proper hoc. Just because it happened
21  after doesn't mean it was caused by. It's easy in
22  the clinical setting to say yeah, it was caused by,

Page 96

1  but when you're testifying to a certain legal or
2  medical standard in court, you have to have
3  something more than just your clinical judgment
4  that's not community standard or peer-reviewed.
5      Q  My question is different. As a
6  psychiatrist or a doctor, do you have any obligation
7  to provide a case report on every patient that you
8  have regarding what you suspect to be the cause or
9  contributing factor of any illness or disease that
10  they may have?
11      A  I don't think you have any obligation. If
12  you were going to report it accurately, you would
13  say I saw a patient who had the following problems
14  following an accident. Unless you are able to do
15  some standardized testing or research, I don't think
16  it's appropriate to say it was caused by it just
17  because it happened after.
18      Q  Did you see any case report out there on
19  ̶L̶i̶n̶d̶s̶e̶y̶ ̶F̶u̶r̶b̶e̶r̶?̶  LF
20      A  Any case report about her?
21      Q  Yes.
22      A  I wouldn't know because they're anonymous.

Page 97

1  I'm not aware of any.
2      Q  But certainly as someone who has now
3  reviewed all of her medical records, you would be
4  able to identify if there was a case report about
5  ̶_̶_̶_̶_̶_̶_̶_̶ in light of the fact that you would
6  know the date of the accident, you would know her
7  treatment before, you would know her treatment
8  after. Even if she wasn't identified by name, you
9  would be able to say wow, there's way too many
10  similarities between this case report and my
11  patient. It has to be the same person.
12      A  I didn't see anything that met those
13  parameters.
14      Q  So you would agree with me there could be
15  lots of patients out there like ̶_̶_̶_̶_̶_̶_̶_̶ with
16  selective mutism following a traumatic event where
17  it just went unreported?
18      A  First of all, the incidence of selective
19  mutism is extremely rare. It's not a common
20  condition. All I can tell you is that all the
21  literature I've researched and anything I know
22  that's out there has not established an etiology or

25  (Pages 94 to 97)

MICHAEL K. SPODAK, M.D. — 4/23/2013

Page 98

1  cause for it.  Whether there are anecdotal case
2  reports that do not meet the standard of research
3  and the standard acceptance of it, there might be,
4  but that's not research.  That's reporting anecdotal
5  stories.  That doesn't constitute cause.
6      Q  But you'd agree with me that even though
7  selective mutism is a rare condition, that it still
8  impacts thousands of children?
9      A  Thousands worldwide?  Probably in the
10  thousands, yes.  I think I read once where the
11  incidence was something like 1 in 40,000.  If you
12  add up the population of children, it would be in
13  the thousands.
14      Q  And if my count is correct, you've read 11
15  articles plus the five or six that were submitted by
16  Dr. Zimnitzky regarding selective mutism.  Is that
17  right?
18      A  Six, yes.
19      Q  Okay.  So assuming my math is correct, and
20  I've accurately counted 11, that would be 17
21  articles regarding selective mutism.  Is that right?
22      A  Not exactly.  Each of those articles has a

Page 99

1  lengthy bibliography where they summarize the
2  findings of other articles.  While I may not have
3  read each and every one of them, one article
4  summarizes lots of others, so you'd really look at
5  the bibliography for each one to add up the number
6  of articles.
7      Q  Let's assume that adding all of that up is
8  500.
9      A  Okay.
10      Q  That still doesn't account for all of the
11  children that suffer from selective mutism in the
12  United States or the world.  Is that right?
13      A  It may account for all the ones that have
14  been studied as to a cause, but it may not account
15  for a population out there that we have no idea
16  about, no.
17      Q  So there could be lots of instances of
18  selective mutism where the cause was a traumatic
19  event.  You just didn't read about it in your
20  research.  Is that right?
21      A  To the extent that they've done research,
22  they have ruled out traumatic events as a cause.

Page 100

1  They've done specific studies, and they have not
2  found it is a cause.  If you're asking me about a
3  group of people they haven't studied, I have no idea
4  what that would be.  Total speculation.
5      Q  Did you read the deposition of
6  Dr. Shipon-Blum?
7      A  Yes.
8      Q  And did you read where she testified that
9  she has in fact treated thousands of children with
10  selective mutism, and although it represents a
11  minority, she has treated children that have
12  developed selective mutism as a result of a
13  traumatic event?
14      A  Again I'd have to go back and look at her
15  deposition page by page.  If there's a page you want
16  to show me out of the deposition, I'd be happy to
17  look at it.
18      Q  I don't have her deposition with me.  I'm
19  asking if you recall that testimony.
20      A  I don't recall specifically.  I'd have to
21  go through the deposition to review it to see if
22  that's there in that specific way you describe it.

Page 101

1      Q  Are you critical of the treatment that
2  ~~                    ~~ received following the automobile
3  collision?
4      A  Am I critical of it?
5      Q  Yes.
6      A  I'm not sure I'd say I'm critical of it.
7  What I found was there did not seem to be much in
8  the way of discussion about the accident and what
9  fears she might have had as an ongoing issue to
10  attempt to reduce those fears and anxieties.  It
11  just seemed to be put aside, and they dealt with
12  talking as opposed to what fears she might have had
13  that predated her selective mutism.
14      Q  Are you critical of the parents' decision
15  to partake in several different providers after the
16  automobile collision?
17      A  I don't know.  That would depend on their
18  motive.  If they were doing it out of genuine
19  concern for their daughter, no, I would not be
20  critical.  If they were doing it out of the
21  furtherance of a lawsuit, then I think that would be
22  probably disruptive to the child.

26  (Pages 98 to 101)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 102

1    Q   Do you plan to offer an opinion one way or
2   the other based on your two hypotheticals at trial?
3    A   I don't believe so. I think I indicated
4   earlier I was not asked to evaluate the parents.
5    Q   No, but you do indicate an opinion number
6   4, that she was not in need of any mental healthcare
7   or treatment nor any pharmacologic intervention as a
8   result of the subject accident of 5-15-08 either at
9   the time of the accident, from the time of the
10   accident to the present time, or at the time of my
11   evaluation of her on page 8.
12    A   Yes.
13    Q   And my question is according to this
14   opinion, although you do not have the opinion that
15   she was in need of mental healthcare or treatment as
16   a result of the accident, my question is are you
17   going to be critical of the mental healthcare or
18   treatment that she received following the automobile
19   collision even though you don't think it's related?
20    A   I don't think I would offer any opinions
21   that it's critical. It focused on selective mutism.
22   Since it was not caused by the accident, then it was

Page 103

1   a condition. She had lots of problems before as
2   well. Even Dr. Zimnitzky indicated she would have
3   been in need of pharmacologic medication following
4   the accident had it never occurred. I don't have a
5   specific criticism, but because we don't have an
6   established cause to the accident, you can't say
7   that it was necessitated by the accident.
8    Q   Other than the visit that ████ had with
9   her pediatrician on the day of the automobile
10   collision, did she require any medical care or
11   mental healthcare or treatment as a result of the
12   automobile collision?
13    A   In my opinion she did not. She had all of
14   the problems of anxiety predating the accident. As
15   I indicated, she seemed to get better from the
16   anxiety and the temper tantrums and the disruption
17   after the accident, and she was treated for
18   selective mutism, a condition for which we do not
19   know a cause, but generally trauma has been ruled
20   out.
21    Q   Did you ask ████ about any fears she
22   may currently have regarding automobiles?

Page 104

1    A   Excuse me?
2    Q   Did you ask ████ about any fears she
3   may currently have regarding automobiles?
4    A   Yes. She said that she's worried a truck
5   will hit the car.
6    Q   Is that a typical response for a child
7   who's been involved in an automobile collision
8   involving a truck?
9    A   I think it's a normal response for anybody
10   who has been in an accident and hit by a truck.
11    Q   Was the automobile collision that ████
12   was involved in a traumatic one?
13    A   Depends on how you define traumatic.
14    Q   I'm asking you.
15    A   Excuse me?
16    Q   I'm asking you based on your definition of
17   traumatic.
18    A   First of all, I don't think there's an
19   established definition of trauma in the context
20   you're asking. If you mean by trauma, it caused
21   some temporary fear and fright and anxiety, sure.
22   If it caused any lasting effects, in my opinion it

Page 105

1   did not. And it did not cause any significant
2   physical trauma.
3    Q   Is it your opinion that the healthcare
4   providers that clinically diagnosed ████ with
5   selective mutism as a result of the automobile
6   collision can make that clinical diagnosis, but it
7   doesn't simply rise to the level required of a
8   forensic assessment?
9    A   I think they can make the clinical
10   diagnosis of selective mutism. In my opinion it's
11   inappropriate to ascribe the cause of it when we
12   don't know what the cause is because there's been no
13   established etiology for the condition.
14    Q   You'd agree with me that at some point
15   someone has to ascribe a cause for there to be a
16   starting point?
17    A   That's not the way medicine works. You
18   start off with a hypothesis; let's look at the
19   question of whether trauma causes selective mutism.
20   Then do you research to see if you can establish
21   whether the hypothesis is true or not. To the best
22   of my review of the literature they've established

27 (Pages 102 to 105)

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 106

1    that the hypothesis is not true. There's no
2    established link between traumatic auto accidents
3    and selective mutism. You don't start with a cause.
4    You start with a hypothesis, and you try to do
5    research and science and experiments, if you can, to
6    either confirm or refute the hypothesis. In this
7    case the state of the literature currently is that
8    the hypothesis has been refuted or at least has not
9    been established. I think it's a little of both.
10   They say that some studies have ruled it out, and
11   some have simply said we don't know yet. There's
12   not enough evidence one way or the other to tell.
13       Q   Let me review my notes. I'm just about
14   finished. I'm going to show you your CV, which I've
15   had marked as Exhibit 1, and have you look at page
16   5, which lists your areas of expertise in the civil
17   forensic arena. Is that right?
18       A   Yes.
19       Q   Would you agree with me that it doesn't
20   list selective mutism?
21       A   It doesn't say expertise. It says
22   extensive experience with the following types of

Page 107

1    evaluations. I think I indicated earlier that I
2    have not done any other specific to selective
3    mutism, although I think it has come up in a couple
4    of cases, so I would not list it as having extensive
5    experience in that area.
6        Q   So the answer is yes, you agree with me
7    that it's not listed there?
8        A   Excuse me?
9        Q   So the answer is yes, you agree with me
10   that it's not listed there?
11       A   Yes, I would agree with that.
12       Q   In your CV you have listed the articles
13   that you've published and the areas in which you
14   have made presentations. None of them deal with
15   selective mutism. Is that right?
16       A   Yes.
17       Q   Since reading Dr. Zimnitzky's report have
18   you changed any of your opinions in this case?
19       A   No.
20       Q   Are you critical of his opinion other than
21   the fact that you disagree about the cause of
22   ████████████ selective mutism?

Page 108

1        A   Putting aside the history and all that,
2    which appears mostly to be from other sources or
3    family, in terms of the formulation, I agree with
4    him that she met diagnostic criteria for selective
5    mutism after the accident. I agree with him that
6    she no longer meets it. I agree with him that she
7    meets criteria for obsessive compulsive disorder. I
8    disagree with him where he did not diagnose ADHD or
9    attention deficit hyperactivity disorder. I think
10   she has been diagnosed with that, and I don't
11   dispute that diagnosis. I agree with him that in
12   ████████ case she presented with multiple
13   preexisting risk factors including family history of
14   preexisting anxiety and family stressors. I
15   disagree with him that the stress of the motor
16   vehicle accident was a significant contributing
17   factor to the onset of selective mutism. I disagree
18   with him that the trauma of the accident was a
19   significant contributing factor to the worsening of
20   ████████ anxiety and obsessive compulsive disorder.
21   I agree with him that had the trauma not occurred,
22   ████████ would likely still have needed treatment

Page 109

1    with psychotropic medications. I disagree with him
2    that at present he recommends weekly psychotherapy
3    with a child therapist experienced in trauma for a
4    period of six months. The accident happened five
5    years ago. I don't believe she is in any need of a
6    trauma specialist for six months at the present
7    time. I think she's essentially recovered from the
8    accident. That would be kind of the synopsis of
9    what I agree and disagree with. I realize your only
10   question was what I disagreed with, but I thought I
11   would add things I agreed with too.
12       Q   Do you think she has any ongoing need for
13   therapy at all right now?
14       A   I think it's in the category of it
15   probably would be helpful, but I don't think it's
16   necessary. She's still got a lot of multiple family
17   issues to deal with.
18       Q   You anticipated where I was going. What
19   would be the reason for the therapy?
20       A   Excuse me?
21       Q   You anticipated where I was going.
22       A   Yeah. I think her ongoing family issues

28  (Pages 106 to 109)

MICHAEL K. SPODAK, M.D. — 4/23/2013

Page 110

1  and a whole range of things she's been through. I
2  don't see any specific need for it as a consequence
3  of the accident, certainly not five years out.
4        MS. PORWICK:  I don't have any other
5  questions.  Mr. McCarron?
6        MR. MCCARRON:  Would you like to read and
7  sign?
8        THE WITNESS:  Yes, I'd like to read and
9  sign.
10       (Signature having not been waived, the
11  Deposition of MICHAEL K. SPODAK, M.D. was concluded
12  at 2:18 P.M.)
13
14
15
16
17
18
19
20
21
22

Page 111

1       ACKNOWLEDGEMENT OF DEPONENT
2       I, MICHAEL K. SPODAK, M.D., do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true, correct
5  and complete transcription of the testimony given by
6  me, and any corrections appear on the attached
7  Errata Sheet signed by me.
8
9  _____   _____
10    (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

Page 112

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Sharon D. Livingston, Registered
3  Professional Reporter, the officer before whom the
4  foregoing proceedings were taken, do hereby certify
5  that the foregoing transcript is a record of the
6  proceedings; that said proceedings were taken by me
7  stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am
9  neither counsel for, related to, nor employed by any
10  of the parties to this case and have no interest,
11  financial or otherwise, in its outcome.
12       IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed by notarial seal this 29th day of
14  April 2013.
15  My commission expires:
16  July 22, 2013
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR THE
21  STATE OF MARYLAND
22

Page 113

1       E R R A T A   S H E E T
2   IN RE:  Farber, et al. v. Beveridge, et al.
3   RETURN BY: _____
4   PAGE    LINE    CORRECTION AND REASON
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____

29  (Pages 110 to 113)

MICHAEL K. SPODAK, M.D. — 4/23/2013

Page 114

1        E R R A T A  S H E E T
2     IN RE: Farber, et al. v. Beveridge, et al.
3   RETURN BY: _____
4  PAGE   LINE   CORRECTION AND REASON
5   ____   ____   _____
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____

Merrill LAD

800-292-4789                          www.merrillcorp.com/law

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 1

| A | | | |
|---|---|---|---|
| **abilities** 41:6 | **acted** 7:21 | 109:11 | **approximately** 9:20 |
| **ability** 53:4 73:8 75:3 | **actively** 90:11 | **al** 1:5,8 113:2,2 114:2 | **April** 1:16 48:19 |
| **able** 8:20 15:10,14 | **actual** 58:19 | 114:2 | 112:14 |
| 17:4 32:2 58:14 | **add** 17:1 21:12 28:22 | **alleged** 36:13 | **area** 33:12,13 107:5 |
| 67:21 78:19 85:10 | 29:1 93:12 98:12 | **allowing** 24:16 | **areas** 56:22 57:14 83:6 |
| 92:19 95:1 96:14 | 99:5 109:11 | **alternatives** 67:17 | 83:14,15,22 92:1,7 |
| 97:4,9 | **adding** 99:7 | **Ambulance** 4:20 | 92:10 106:16 107:13 |
| **abnormal** 45:16 | **addition** 28:21 | **America** 36:11 | **arena** 106:17 |
| **absent** 68:16 | **additional** 21:13 22:3 | **amount** 34:5 | **arm** 73:19,20,22 74:4 |
| **Absolutely** 36:18 | 26:5 54:22 | **analysis** 73:2 | 74:8,10,14,15,18,20 |
| **abuse** 15:13 70:8,15 | **ADHD** 108:8 | **anecdotal** 98:1,4 | 74:22 |
| 70:17,19,20 71:2,3 | **ADKINS** 3:7 | **Ann** 29:2 | **Arthur** 43:11 |
| **academic** 4:22 31:5,14 | **administer** 43:2 | **anonymous** 96:22 | **article** 69:18 70:4 77:6 |
| **accept** 93:19 | **administered** 5:3 | **answer** 12:11 34:20 | 99:3 |
| **acceptance** 75:16 77:7 | **adolescent** 6:12,17,20 | 35:7,16,18 36:6 37:2 | **articles** 4:11 24:17,18 |
| 77:11 85:14 98:3 | 7:11 11:8 16:9,14 | 37:8 39:4 40:1 48:18 | 25:4,11,12,14 26:9 |
| **accepted** 68:11 95:8 | 24:14 | 73:9 83:2,11,15 | 26:12 29:4 31:21,22 |
| **accident** 20:9 47:8,13 | **adolescents** 7:3,6,11 | 86:20 91:6 107:6,9 | 65:10,17,19 69:12 |
| 47:15 48:5,20 49:2,5 | 11:2,5 41:17,19 | **answered** 91:2 | 70:10,17 71:1,7 |
| 49:16 50:7 51:5,7 | **adult** 55:7 | **answering** 83:7 | 98:15,21,22 99:2,6 |
| 57:8,17 62:6,8,17 | **adults** 17:10,11 41:17 | **answers** 24:10 36:5,8 | 107:12 |
| 64:2,5 72:9,21 73:2 | 41:18 43:1 | 92:17 | **ascribe** 84:20,21 |
| 73:19,22 74:7,9,22 | **Adventist** 27:21,22 | **anticipated** 109:18,21 | 105:11,15 |
| 75:8 78:4 79:5,15 | **affidavit** 4:15 | **anxieties** 101:10 | **ascribing** 58:16 |
| 81:1,18 82:12,16,21 | **affidavits** 27:3 | **anxiety** 63:21,22 64:11 | **aside** 101:11 108:1 |
| 84:8,11 85:15 88:19 | **affirmative** 85:4 | 64:12 68:13,21 69:2 | **asked** 15:16 20:7 |
| 88:20 89:10,15,17 | **affixed** 112:13 | 69:6,8 75:21 88:15 | 40:20 41:9,16 45:15 |
| 90:15 94:11 96:14 | **afternoon** 53:12 | 88:18 103:14,16 | 79:17 80:19 81:12 |
| 97:6 101:8 102:8,9 | **afterward** 95:10 | 104:21 108:14,20 | 82:13 84:13 86:19 |
| 102:10,16,22 103:4,6 | **age** 7:11,13 17:21 18:5 | **anxious** 49:6 68:19 | 91:1,4 102:4 |
| 103:7,14,17 104:10 | 18:9 41:20 45:3,12 | **anybody** 76:5 104:9 | **asking** 38:16,18 72:16 |
| 108:5,16,18 109:4,8 | 46:17,18 59:7 60:3 | **anymore** 8:13 | 72:17 75:9,9 77:19 |
| 110:3 | 83:20 91:19 92:19 | **apologize** 22:22 | 83:13 100:2,19 |
| **accidents** 64:8 69:19 | **ages** 7:9 | **apparently** 89:9 | 104:14,16,20 |
| 106:2 | **age-appropriate** 90:19 | **appear** 111:6 | **asserting** 35:18 |
| **accommodate** 5:21 | **ago** 58:3 109:5 | **appears** 29:18 30:22 | **assessment** 105:8 |
| 76:8 | **agree** 13:21 15:20 | 50:1 51:8 88:18 | **assign** 81:14 |
| **account** 99:10,13,14 | 18:15 49:22 50:12 | 108:2 | **assistance** 41:16 |
| **accurate** 66:18 67:14 | 57:20 62:5 64:9 69:1 | **applicable** 13:13,20 | **assistant** 51:16,20,21 |
| **accurately** 14:19 | 74:11 75:4 85:17 | 15:6 55:7 70:5 | **assistants** 22:16 |
| 96:12 98:20 | 86:6,16 88:13 97:14 | **apply** 72:20 | **associated** 71:8 |
| **acknowledge** 111:3 | 98:6 105:14 106:19 | **appointment** 90:4 | **association** 37:22 38:3 |
| **ACKNOWLEDGE...** | 107:6,9,11 108:3,5,6 | **appreciate** 34:13 | 64:6 70:12 71:11,12 |
| 111:1 | 108:11,21 109:9 | **appropriate** 16:6 | 71:14,15 72:3 |
| | **agreed** 65:16 68:21 | 42:16 96:16 | **associations** 68:18 |

MICHAEL K. SPODAK, M.D. – 4/23/2013

assume 99:7
assumed 50:6
assuming 46:8 98:19
ATI 24:9
attach 55:12
attached 4:7 6:3 21:18
  26:1 27:17 28:12
  29:9 30:1 31:9 49:11
  81:17 111:6
attempt 15:1 27:2 56:3
  56:4 57:6,12 58:1,9
  61:4,5,8 62:4 101:10
attempted 25:15
attention 108:9
attorney 34:21 35:8
attributed 93:22
attribution 58:6
August 27:2,8 61:17
author 21:11
authoring 21:21
autism 68:9,11
auto 73:21 74:22
  106:2
automobile 20:9 49:18
  50:20 62:21 63:8,18
  63:22 64:2,5,7,10,16
  65:1,6 69:19 72:5,6,9
  72:13,14,15 73:12
  74:5,13,16 75:5
  80:19 81:5,8,16 83:9
  83:17 84:16 85:2,11
  85:15,20 86:8,14,18
  88:5,15 90:11 91:13
  92:2,4 93:22 101:2
  101:16 102:18 103:9
  103:12 104:7,11
  105:5
automobiles 103:22
  104:3
available 43:14 77:14
Avenue 2:5
average 16:20,22 17:5
aware 35:10,14 66:2
  68:12 97:1
awhile 76:2

A.M 1:17
_____
B
B 4:6
back 24:15 27:1 33:20
  33:21 41:12 47:14
  60:10 73:1 100:14
background 44:6
  51:16,21 52:9,18
  53:11 54:6,11,22
  55:5 71:10 79:9
Baltimore 3:9,17
  33:12
based 30:14 35:9
  78:21 102:2 104:16
basically 45:12 46:1
  49:2 81:1
basis 16:20 17:5,12
  37:20 39:5 40:2
battery 40:20 43:1
  44:22
beginning 51:9
behalf 3:4,13 5:5 32:4
  32:5,7
behavior 47:16 50:19
  87:9
BEKMAN 3:6
believe 6:21 12:13
  19:8,22 43:22 44:2
  50:9 69:15 89:5
  102:3 109:5
bell 93:1
beneficial 40:11
benefits 35:21 36:2
  39:8
Berkshire 36:9
best 11:14 16:4 50:17
  55:18 66:21 67:21
  75:22 78:19 80:16
  105:21
better 8:11 62:15,16
  71:19,20 72:1 73:9
  90:16 103:15
Beveridge 1:8 113:2
  114:2

bevy 67:16
beyond 38:20 57:11
  73:7 75:17 79:18
bibliography 99:1,5
big 11:18 82:6
billed 34:8
bit 10:6 62:14 81:19
  93:17
bite 69:17
black 80:21
board 6:19 16:13
  17:16
boards 6:20 16:16
board-certified 6:5,8
  6:16
bothering 14:12
Bowen 3:15 20:16
breach 37:17,19
break 5:20 15:19 17:4
  32:3 76:4,6,7,10
breast 29:15
Brian 22:4
brief 56:20 59:2
bringing 82:22
brings 14:3
broken 73:19 74:13,22
Brooke 29:12,18 48:16
  50:10,13,15 83:1,3
bruising 74:19 75:2
bunch 15:17 49:4
  82:13
_____
C
C 3:1 4:1 5:1
call 41:21 57:8,11,12
called 21:10 57:16
  58:5
cancer 29:15
capable 41:6
car 62:5,8,17 73:18,20
  73:21 74:18 104:5
care 8:20 9:6,9 48:15
  103:10
career 11:1 39:12
case 9:16 14:14 17:6

19:21 20:2,5 21:3
  22:10 24:21 31:20
  34:3,5 35:6,17 36:13
  38:1,4,7 40:4,8 41:22
  42:19 43:15 46:7
  49:19 51:22 53:14,19
  54:12,20 58:7,20
  60:2,13 69:16,22
  70:4,5,7 76:15 87:3
  95:13 96:7,18,20
  97:4,10 98:1 106:7
  107:18 108:12
  112:10
cases 20:16,18 32:9
  41:16 59:18,20,21
  60:1 95:12 107:4
categorized 37:10
  66:19
categorizing 58:12
category 90:17 109:14
causation 13:18 14:1
  14:11 16:6 25:10,17
  71:11 72:2
cause 14:2,9,16,20
  15:6,8,10,12,14,22
  64:10,12 65:18 66:4
  66:5,7,17,19,20 67:2
  67:4,8,10,15,17,22
  68:2,9,11,12,13,14
  70:9,11,18,19,20
  71:4,5,17 72:15,19
  73:3,7,8,8,9,12,22
  75:5,9,13,20 76:19
  77:12 84:22 85:5,7,9
  85:9 86:5 88:9 94:1
  94:5,7,12,16,19 95:2
  95:4,10,14 96:8 98:1
  98:5 99:14,18,22
  100:2 103:6,19 105:1
  105:11,12,15 106:3
  107:21
caused 72:4,6,8,14
  74:13,22 85:2 95:21
  95:22 96:16 102:22
  104:20,22

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 3

causes 14:19 65:13
68:20 84:12 105:19
CCAS 24:12,13
CeeCee 80:21,22
Center 24:14
certain 13:12 22:8
53:3 56:20 68:17,19
72:19 91:14 96:1
certainly 30:20 45:17
57:10 58:4,15 64:4,8
76:6 93:2 97:2 110:3
certainty 13:19 14:2
14:11 82:8
CERTIFICATE
112:1
certification 17:16
certifications 16:13
certify 112:4
cetera 75:16
chance 28:22
change 19:10 58:1
changed 107:18
charge 33:4 58:17
Charles 3:16
child 6:12,16,19 7:5,8
7:10 11:14 12:7,8,13
12:16,20 13:22,22
14:3 15:12 16:1,9,14
17:7 19:15,18 24:14
41:6 42:15 44:16,21
46:11 49:8 50:11
54:12,13,16 59:18,22
60:3,8 67:11 82:1
83:20 92:18 101:22
104:6 109:3
children 6:15 7:3,12
10:17,19,19,21 11:11
11:13,15,19 12:17,19
12:22 13:1,10,14
16:18,19 18:17,18
19:17 20:20 21:1
40:14,17 41:15,20
43:2 55:8 59:5,7
64:18 69:13,20 70:14
71:18,21 91:19,22

98:8,12 99:11 100:9
100:11
children's 64:22 65:5
child's 46:11
choice 13:6
choose 13:1 41:1
chose 79:5 82:11
chronologically 23:6
chronologies 4:14
27:8
chronology 27:1 43:21
61:20
circumstances 82:13
cited 26:9 29:4 32:1
68:8 69:15,18
civil 1:6 9:21 10:1
106:16
claim 34:17 36:21
claimed 39:1
claiming 39:7
clear 35:4 36:4 47:19
68:4 74:2
CLEMENTS 3:6
Clifton 33:2
clingy 49:9
clinical 8:15 9:12 10:2
10:17 11:11 13:2
15:21 16:18 18:4
39:12,21 63:15 64:19
72:18 73:3 75:9,12
95:12,22 96:3 105:6
105:9
clinically 72:20 105:4
clip 30:13
close 80:3
coach 60:16
coaching 60:19
cognitive 36:22 39:2
coherent 79:7
cohort 69:21 71:8
coincidence 88:4,10
collateral 13:11 46:16
collected 77:18
collision 49:18 50:20
62:21 63:8,11,12,13

63:18 64:1,10,16
72:5,6,13,14,15
73:12,21 74:5,13,16
75:5 80:20 81:5,8,9
81:16 83:9,18 84:16
85:3,11,20 86:9,14
86:18 88:5,16 90:11
91:13 92:2,5 94:1
101:3,16 102:19
103:10,12 104:7,11
105:6
collisions 65:1,6
color 91:5,5
come 13:12 23:4 26:12
43:16 60:9 70:6
107:3
comes 14:11
comfort 60:20
coming 44:17
commenced 39:1
comment 38:22 79:18
comments 50:5
commission 32:16
112:15
common 71:10 97:19
commonly 59:17
communicative 78:13
78:15 81:13,15 87:12
93:18
community 77:1,7
85:14 95:8 96:4
Company 36:10,11
Compensation 32:16
compiled 28:3,18 31:1
57:3
complaint 24:7 37:9
89:18
complete 14:8 53:10
111:5
completed 30:19
completeness 56:19
component 42:20,22
43:8
compulsive 108:7,20
computer 26:7

computerized 43:1
concentration 8:12
concern 101:19
concerted 14:7
concluded 110:11
condition 14:22 18:14
18:16 47:13 63:22
74:15 75:6,7,18
77:12 97:20 98:7
103:1,18 105:13
conditions 16:3 37:10
conducts 54:5
confident 41:5
confidential 37:21
confine 8:14
confined 12:20 51:16
confirm 106:6
confirmed 68:7
conflict 55:9
conjunction 41:10
connection 76:21
consensus 67:8
consequence 110:2
consider 43:7 76:18
considered 7:12,12
17:21 66:5 67:4
considering 14:21
consistent 79:8 93:5,8
consists 22:10
constantly 82:3 84:12
constitute 98:5
contacted 19:20 21:3
contained 24:5 54:1
55:6 56:1 57:13 65:2
65:9 68:6 78:3
content 90:17,18,22
91:2
contents 4:10 21:11
26:17 28:18 29:1
context 50:9 75:1
76:18 93:20 104:19
continue 9:5 39:8
continuing 36:17
contract 37:17,19
contractual 38:20

MICHAEL K. SPODAK, M.D. - 4/23/2013

Page 4

contributing 85:11,16
85:21 86:4 94:1,7,20
95:4 96:9 108:16,19
contrived 82:18
control 47:16 48:21
49:10,12 50:3
conversation 42:11,13
45:20 46:6 53:5 80:4
80:7,11
copied 24:1
copies 24:1,4 28:15
copy 5:22 21:10,10
53:21 77:13 79:21
80:2
correct 8:6 13:3 28:20
64:20 86:22 91:8
98:14,19 111:4
CORRECTION 113:4
114:4
corrections 111:6
correspondence 4:13
26:18,19,22 27:5,6
cost 53:8
counsel 112:9
counseling 52:7
count 32:17,19 82:19
98:14
counted 98:20
couple 17:9 49:2 90:16
93:16 94:11 107:3
course 74:12
court 1:1 13:20 15:6
16:6 35:7,10 36:8
60:12 96:2
court-ordered 61:1
cried 81:5
criminal 9:21,22 32:19
criteria 86:7 108:4,7
critical 101:1,4,6,14
101:20 102:17,21
107:20
criticism 103:5
CSR-RPR 1:22
current 10:16 11:4
67:11

currently 7:14 8:9
33:4 35:20 103:22
104:3 106:7
curriculum 4:9
curve 93:1,4
custody 12:3 17:2
59:21 60:1
cut 33:20 50:11
cutoff 7:10 18:2,5
41:20
CV 1:7 5:22 106:14
107:12

---

## D

D 1:22 2:9 5:1 112:2
date 22:17 34:3 44:1
47:19 67:8 97:6
111:10
dates 22:15,17
dating 27:1
daughter 101:19
day 33:14,15 44:10,14
45:4 62:4 67:10
89:22 90:1 103:9
112:13
days 81:9
deal 13:16 107:14
109:17
dealt 7:6 20:19 83:8
101:11
December 30:19 37:11
39:2
decision 101:14
decline 34:20 36:6
37:2,7 39:4 40:1
89:14,18,19 90:2
defendant 32:5,21
Defendants 1:9 3:13
defense 32:7,13 33:3
38:5,7,11,17
defense's 38:14
defensive 91:17 92:22
deficit 108:9
define 104:13
defined 77:9

defining 73:16
definite 58:15
definition 18:8,22
19:1,2,4,11 104:16
104:19
degree 13:19 14:1 82:7
delay 50:8
deliberate 58:6
demanding 48:21 49:9
Department 32:16
depend 63:1,6,10
101:17
depending 18:5 44:15
45:2 46:16
depends 14:5 62:12,20
72:16 75:7,8,17
104:13
depo 28:2
DEPONENT 111:1
deposition 1:13 2:1
4:7 28:4,5 29:1,2,3
31:2,4 37:22 94:6,18
95:3 100:5,15,16,18
100:21 110:11
depositions 5:9 22:3
28:7,16 31:17 54:21
82:20 93:21 94:22
depth 56:22
describe 100:22
described 47:16 50:15
describes 48:20
description 49:1
detail 57:12 83:12
92:5
detailed 73:1 92:13
details 84:8,11
determine 19:18 20:8
58:10
determined 35:13
developed 54:8,9,10
69:13 70:14 84:14
90:14 100:12
developing 76:16
development 85:21
devoted 7:3

diagnose 108:8
diagnosed 49:19 86:12
86:17 87:16,19 105:4
108:10
diagnoses 69:10
diagnosis 18:12 67:19
69:2 87:13 88:2,14
105:6,10 108:11
diagnostic 86:7 108:4
dictate 27:12 30:7
dictated 27:10,13
DiFazio's 94:6
difference 11:18,20
13:7
different 14:16 15:17
33:11 44:17 46:21
47:2,5 50:21 51:12
55:18 56:22 69:9,21
82:2 85:3 87:18 96:5
101:15
differs 57:22
disability 34:14,17
35:6,17,21 36:2,15
36:20,20 37:5 38:10
38:10 39:1,3,7,7
disabled 34:18 36:14
37:1 38:8
disagree 107:21 108:8
108:15,17 109:1,9
disagreed 109:10
discharged 9:9
discord 87:7
discount 70:10
discrepancies 55:15
55:21 57:2,11
discrepancy 56:5,7,11
56:15 57:9
discrepant 57:10
discussed 69:12
discussion 101:8
disease 95:14 96:9
disorder 64:7,15 108:7
108:9,20
dispute 19:3 38:20
86:15 108:11

MICHAEL K. SPODAK, M.D. - 4/23/2013

disputed 89:10
disruption 88:19 103:16
disruptive 101:22
distinct 13:14
distinction 11:17 13:4
distress 81:19
DISTRICT 1:1,2
DKC 1:7
doctor 28:14 76:13 89:20 95:11 96:6
doctor's 90:4
dog 69:17 83:1,3
doing 10:3,11 12:1 27:2 30:20 33:20 41:6 45:18 46:10 49:3 52:22 53:2 54:15,19 56:10 59:10 59:21 65:11 101:18 101:20
dollars 33:16 34:7
DOUGLAS 1:8
dozens 17:1
Dr 5:7 22:4 26:9 29:3 32:1 40:4,7 41:21 43:3,11,14 44:13 45:6,21 46:6 62:3 65:10,22 68:8 69:16 93:6,9 94:6 95:3 98:16 100:6 103:2 107:17
DSM 19:6 69:7
DSM-IV 18:22 19:2,3 19:12
DSM-V 19:12
due 19:8 34:19
duly 5:3
duplicative 27:5
Dushek 29:2

E

E 3:1,1 4:1,6 5:1,1 113:1,1,1 114:1,1,1
earlier 25:6 29:13 32:22 73:1 87:8 89:4

102:4 107:1
early 86:10
easy 95:21
edition 19:5
education 79:9
effects 104:22
efficient 52:21 53:7,8
effort 14:7 47:6
either 15:10 18:9,10 23:2 30:20 32:17 55:14 68:22 72:12 92:16 102:8 106:6
eligible 6:19
eliminate 15:11 16:1
emergency 8:19
emotional 60:20 63:11 72:10 73:17 75:2,6 81:19 84:15
employed 112:9
employee 52:11,14
employment 48:13
encompassed 24:18
ended 23:19
ends 28:19
engaging 79:3
entire 69:20
equal 95:20
Errata 111:7
especially 46:17
ESQUIRE 3:5,14
essentially 66:16 94:16 109:7
establish 75:14 93:16 105:20
established 65:18 66:22 67:1,3,8,15,16 70:18 75:19 84:19 85:7 86:1,3 88:9,11 94:15 95:8 97:22 103:6 104:19 105:13 105:22 106:2,9
establishes 75:12
establishing 72:19
et 1:5,8 75:16 113:2,2 114:2,2

etiologic 76:21
etiology 25:10,17 65:16,18 66:3 67:1,1 67:3 68:2,22 70:19 70:22 75:12 84:19,21 85:7 86:2,3 88:9,11 94:15 97:22 105:13
evaluate 12:16 13:6 16:19 59:21 102:4
evaluated 6:15 25:7 45:11 48:11 91:22
evaluating 11:19 13:5 13:8 44:21 58:7
evaluation 4:17 11:14 12:1,7 19:14 20:8 21:7 27:2 30:17,18 33:8 40:12 41:10 42:6,14 43:6,8,20 44:1,14,21 45:7,21 46:11 53:16 54:12 58:9,18,19,21 93:5,8 93:19 102:11
evaluations 10:19 17:2 17:3,11 20:20 21:1 33:1 41:7 43:3 44:12 55:7 59:5 82:3,20,21 107:1
event 68:17 69:14 71:16,18 76:17 85:20 86:4 97:16 99:19 100:13
events 68:19 71:2 75:20 85:19 87:4,6 99:22
evidence 67:7 74:21 87:21 88:1 106:12
exacerbated 64:1,3 74:14
exacerbating 14:21
exacerbation 63:21 75:5
exact 47:19
exactly 31:6 98:22
EXAMINATION 4:2 5:5

examined 111:3
examiner 32:15
example 15:11 17:5 47:15 54:20 55:9 62:12,20 71:2,18 73:18 74:2,3 91:4
exceedingly 93:4
exceptionally 91:19
excess 52:10
excessively 92:22
exclusively 33:3 55:4 72:6,14
Excuse 20:4 30:4 37:18 52:13 56:8 62:7 66:10 68:10 71:13 78:14 80:9 81:3 93:7 104:1,15 107:8 109:20
exhaustive 14:13 15:2 16:5
exhibit 4:9,10,11,13 4:16,17,19,20,21,22 6:1,2 21:16,17,20 25:18,19,22 26:15 27:15,16 28:10,11 29:6,7,7,20,22 31:7,8 31:13,15 54:3 65:21 87:12 106:15
exhibited 87:19
Exhibits 4:8 29:8
existed 74:15
expand 83:15,19
expanding 84:1
expansive 56:21 83:21 84:5 91:20
expect 59:8 83:20 84:5 91:19 93:14
expectations 45:14
expected 45:13 84:7 84:10
experience 52:21 62:6 62:9,11 63:17 70:3 91:21 92:18 106:22 107:5
experienced 109:3

experiences 68:20
experiments 106:5
expert 22:4 35:12
expertise 106:16,21
expires 112:15
explain 41:22 42:13
  89:21
explaining 55:22
exposure 12:4
expressive 93:3
extensive 106:22
  107:4
extent 46:2 50:2 57:6
  86:4 99:21
extremely 49:11 58:21
  97:19
e-mails 27:3

**F**
face 13:15 14:6 15:4
  73:4
fact 14:17,21 15:22
  35:12 37:9 38:8
  49:22 67:4,16 69:5
  81:15 84:14 85:4
  86:12 97:5 100:9
  107:21
factor 59:16 62:22
  63:14 82:6 85:11,16
  85:21 94:1,8,20 95:4
  96:9 108:17,19
factors 14:9,15 44:18
  71:10 79:6 82:17
  108:13
failed 36:14
fair 5:12 27:12 34:9
  43:17 59:1 73:19
fairly 42:22 43:7
  45:18 59:2 74:1,21
fairness 58:7
fall 25:3 69:9 74:8
  81:22 86:10
false 58:5
familiar 43:5
family 5:8 13:15 14:6

15:4 50:4 87:6 88:22
  108:3,13,14 109:16
  109:22
far 61:22 68:20 88:18
  89:4
Farber 1:5 4:10,13,21
  4:22 5:8 20:8 21:7
  27:8 29:12 30:17
  42:6 43:20 45:7 48:4
  48:18 49:15 57:19
  62:2 86:7 88:6,22
  89:13 96:19 97:5
  101:2 113:2 114:2
Farber's 49:1 57:15
  107:22
fashion 23:13
fatigued 45:4
fear 104:21
fears 101:9,10,12
  103:21 104:2
federal 35:10
feel 38:22 47:17 51:3
  72:21
fees 34:2
fewer 84:10
filed 34:13 36:9,19
  37:17,19 81:20 84:16
financial 112:11
find 15:10 44:20 52:21
  53:6 59:8,11 69:12
  70:14 87:21
findings 40:22 42:16
  93:6,9 99:2
fine 25:21
finished 106:14
fire 4:20
firm 20:17
first 15:16 19:20 27:1
  38:9 42:21 43:21
  44:2 51:14 61:8 71:7
  77:17 78:7 79:2 81:8
  88:21 89:2 93:14
  97:18 104:18
fit 23:6
five 59:11 98:15 109:4

110:3
five-minute 76:6
fixing 34:13
flat 33:14,15
flip 89:22
focus 15:5 82:19
focused 14:10 25:16
  102:21
focusing 82:21
folder 27:4
follow 19:2 54:4
following 63:17 64:7
  64:15 69:13,17 70:8
  70:15,16 76:16 84:15
  96:13,14 97:16 101:2
  102:18 103:3 106:22
follows 5:4
foot 71:20 72:2
foregoing 111:4 112:4
  112:5
forensic 6:11 9:15,18
  9:19 11:15 12:2 13:5
  13:6,8 15:3 16:8,12
  16:14,19 17:6,10
  19:14 32:2 33:5,18
  35:12 39:8 41:11
  42:20,22 43:8 52:22
  72:17,18 73:5,11
  105:8 106:17
forgot 29:11
form 67:20 72:7
formal 7:4
formulation 108:3
forthcoming 59:14
found 25:12 45:16
  46:2 52:22 53:10
  57:13 58:5,12,15
  59:12 67:10 77:11
  87:15 100:2 101:7
fracture 74:6,20
fractured 74:4
frame 47:14
free 51:3
frequently 17:11
fright 104:21

frightened 80:22 81:6
front 42:3
fully 83:7
further 17:4 23:3
furtherance 101:21
future 19:6

**G**
G 5:1
gained 55:10,11
gaining 58:8
gather 76:1
gathered 24:19 77:22
gathering 55:3
Gee 94:12
general 12:21 33:12
  72:17 75:16 77:6
generalized 69:8
  75:21
generally 65:14 77:11
  90:18,19,22 91:17
  103:19
generated 27:1 34:3
genetic 68:1
genuine 101:18
geriatric 17:17,18,22
  18:3,8
germane 53:14
getting 19:5 33:19
give 16:21 37:22 47:17
  92:16,19
given 5:9 85:8 111:5
giving 33:10 91:6
glass 80:21
glean 67:21
go 30:13 32:10 36:6
  42:8 44:18 53:1 60:9
  69:7 72:22 73:6
  75:16 76:10 78:10
  100:14,21
goal-directed 79:8
going 5:22 19:1 29:19
  34:19 35:6 36:4,6
  37:2,7,14 41:12
  44:13 47:3,14 53:12

58:11 61:7,10 76:1
77:20 78:19 92:14
96:12 102:17 106:14
109:18,21
**good** 46:18 74:21
**gotten** 54:20 81:21
**gradual** 90:1,3
**group** 100:3
**Grove** 27:21,22 28:1
**guarded** 91:9,10 92:16
**Guardian** 36:10
**guess** 8:11 29:14 44:15
45:16 53:9 57:18
72:16
**guesstimate** 34:6
41:12 51:17
**GW** 48:14

**H**

**H** 4:6 113:1 114:1
**half** 51:18
**hand** 13:16 112:13
**handwriting** 52:5
**handwritten** 4:16
**happen** 9:2 64:8 77:13
**happened** 58:2,3 89:9
94:11 95:10,20 96:17
109:4
**happens** 56:18 67:5,6
**happy** 5:21 76:8
100:16
**Harding** 52:6,12,14
53:4 54:4,15 55:10
55:16 56:14,15 57:3
77:18
**Harding's** 53:16,21
**heal** 82:5
**health** 57:17 63:16
**healthcare** 10:8,13
93:22 102:6,15,17
103:11 105:3
**hear** 5:15,17 62:15
**held** 2:2
**hello** 61:16
**help** 15:15 16:1

**helpful** 53:6 109:15
**hereunto** 112:12
**hesitant** 64:9
**hesitate** 5:20
**high** 49:7
**highlight** 22:16,19,22
23:5 55:21 56:3
**highlighted** 22:18 23:7
30:15
**highlighting** 30:11
**highlightings** 22:13
**highlights** 22:14
**highly** 49:6
**historian** 46:18
**historical** 59:11
**histories** 52:9
**history** 35:19 37:3,8
47:3 48:10 51:17
52:18 53:2,11 55:5
55:22 58:1 74:17
77:21 108:1,13
**hit** 73:20 104:5,10
**hitting** 49:11
**hoc** 95:19,20
**hold** 7:14,17
**home** 92:11
**Hopkins** 7:1
**Horton** 43:11
**hospital** 7:15 8:5,20
9:7,8 27:21,22 33:2
37:5 39:18 48:14
80:22
**hospitalization** 8:19
9:4 70:3
**hospitalized** 39:20
69:21
**hospital-based** 8:10
**hour** 33:4,6,22 51:18
51:18
**hours** 33:21
**hundreds** 17:1
**hyperactivity** 108:9
**hypothesis** 105:18,21
106:1,4,6,8
**hypotheticals** 102:2

**hypovolemic** 70:1
**H-a-r-d-i-n-g** 52:6
**H-o-r-t-o-n** 43:12

**I**

**idea** 61:12 88:8 99:15
100:3
**ideal** 93:15
**identification** 6:3
21:18 26:1 27:17
28:12 29:9 30:1 31:9
**identified** 32:20 68:2
68:16 71:16 97:8
**identify** 15:22 73:8
97:4
**ignores** 47:17
**illness** 95:14 96:9
**IME** 38:3,5
**immediately** 51:5
**impact** 20:9 62:21
**impacts** 44:20 98:8
**impairment** 36:22
**important** 5:17 46:15
55:2
**inability** 49:12
**inappropriate** 105:11
**incessantly** 81:8
**incidence** 97:18 98:11
**include** 33:7
**included** 23:9,21,22
29:15 31:3,12
**including** 108:13
**increase** 64:10,12
**independent** 32:15
65:4,7 79:10
**indicate** 48:2 80:18
89:18 102:5
**indicated** 25:6 48:14
70:17 73:1 90:13
102:3 103:2,15 107:1
**indication** 87:15
**individual** 55:16
**individuals** 50:17
**information** 25:9,16
26:8 31:12,14 37:15

44:7 46:16 48:4
51:22 54:6,12,16
55:3,10,11 57:3,4
58:8 59:9,11 77:18
77:22 78:3,4 91:7
**injured** 63:2,4,7 70:2
**injuries** 12:4 17:2
**injury** 72:4,8,9,10,12
72:13 73:11,16 74:1
74:9 75:2
**inpatient** 8:13
**inquire** 92:10
**insisted** 62:2
**insistence** 61:21
**instance** 56:6,9,13
60:13
**instances** 41:8 99:17
**insurance** 34:14 36:10
36:11
**intake** 4:14
**interest** 12:19 112:10
**interested** 43:15
**interrogatories** 24:10
**intervention** 102:7
**interview** 46:11,20
51:11 53:3 54:15
55:15 56:14 58:22
59:1,2,6 60:5,17 61:4
61:5,9 62:4 77:19
78:9,11 79:2,11,22
80:13 87:1
**interviewed** 61:9,11
**interviewing** 13:10,10
**interviews** 78:1
**investigating** 67:18
**investigation** 14:14
**involved** 14:15 21:1
41:16 104:7,12
**involvement** 40:7
**involves** 13:9
**involving** 104:8
**issue** 49:19 56:19
101:9
**issues** 35:9 38:21 43:4
43:4 44:16 49:2

MICHAEL K. SPODAK, M.D. – 4/23/2013

57:10 87:7 109:17,22

---

**J**

**January** 49:12
**Job** 1:20
**Johanna** 29:2
**Johns** 7:1
**judgment** 96:3
**Judy** 52:6
**July** 47:15 87:14
  112:16
**June** 47:18 51:9

---

**K**

**K** 1:14 2:1,4 4:2 5:2
  110:11 111:2
**KATHARINE** 3:5
**Katy** 5:7
**keep** 34:10
**keeping** 31:11
**keeps** 15:8 82:22
**kept** 31:15
**kicking** 49:11
**kids** 17:6
**killed** 63:7
**kind** 15:2 16:4 47:7
  109:8
**know** 5:9,12 16:21
  18:1 19:10 20:15
  22:9 23:8,12 28:14
  33:17 34:2 41:5 47:1
  57:8,18 59:13 61:3
  64:2 66:13 70:21
  73:9,15 74:6 76:5
  77:5,9 83:10 88:11
  89:4 94:4 95:18
  96:22 97:6,6,7,21
  101:17 103:19
  105:12 106:11
**knowledge** 75:22 77:1
**known** 84:21 85:9
**Kurtz** 29:3
**Kurtz's** 95:3

---

**L**

**Labor** 32:17

**lack** 8:11
**lapse** 8:8,9
**larger** 71:18,21
**lasted** 80:14
**lasting** 104:22
**latest** 36:3
**law** 20:17
**lawsuit** 34:14 36:9,19
  36:21 37:16,20 81:20
  84:16 101:21
**lawyer** 38:12
**LCSW-C** 24:13
**lead** 12:4 17:2
**learn** 46:21 47:5 50:20
**learned** 47:4 49:14
  50:9 56:15,16 57:4
**leave** 47:22 48:15
**Lee** 40:7
**left** 33:1
**legal** 13:13 38:21
  72:19 73:6 75:9,14
  96:1
**lengthy** 99:1
**letters** 27:19
**letting** 82:4
**let's** 9:10 75:1 78:10
  99:7 105:18
**level** 105:7
**license** 7:18,20
**life** 36:10,10 68:19
  69:14 87:4 90:7
  92:15
**light** 35:11 97:5
**liked** 83:8
**limits** 47:17 49:13
  ███████ 7:16
  ███████1:10,13,17,21
  4:22 20:8 21:6 27:8
  30:17 40:13 42:6,18
  43:20 44:8 45:7,21
  48:2,21 49:1,4,6,7,13
  49:18 50:10,15 51:4
  58:20 59:13 60:3,17
  60:21 61:2,3,11,13
  61:14,17,22 62:3,3

78:9,11 79:11 80:4,8
  80:12 81:10 86:6
  88:6,13,22 90:11
  93:5,8 96:19 97:5,15
  101:2 103:8,21 104:2
  104:11 105:4 107:22
  108:22
████████44:7 46:18
  46:20 47:6,8,18
  48:16 49:16 50:19
  57:7,16 60:16 69:22
  87:4 89:13 92:19
  93:21 108:12,20
**line** 36:17 113:4 114:4
**link** 106:2
**list** 24:6 106:20 107:4
**listed** 21:20 107:7,10
  107:12
**lists** 24:12 106:16
**literature** 25:8 64:21
  65:2,4,11 66:2,7,8,9
  66:11,12,14,14,16
  67:9,12,22 68:7
  69:11 70:13 75:11,15
  75:19 76:22 77:8,10
  85:13,18 86:3 94:10
  94:14 95:7 97:21
  105:22 106:7
**litigation** 5:8 84:12
**little** 5:19 10:5,6 36:7
  51:6 60:8 62:14 76:4
  76:7,10 81:19 82:22
  87:18 91:21 106:9
**Livingston** 1:22 2:10
  112:2
**LLC** 3:7
**locations** 24:2,3,5
**long** 9:16 39:22 51:11
  58:19,21
**longer** 108:6
**look** 13:16,17,18 14:1
  14:7,18 22:12 27:4
  44:1 52:5 71:9 73:7
  89:12 94:13 99:4
  100:14,17 105:18

106:15
**looked** 65:3
**looking** 13:11 14:2
  15:5 34:5 55:15 59:9
  73:5 77:16
**looks** 25:1 80:5
**lot** 38:21 53:13 56:19
  57:20 59:8 81:12,17
  81:17 83:19 91:18,22
  109:16
**lots** 56:18 97:15 99:4
  99:17 103:1
**lower** 78:8
**lunch** 76:5

---

**M**

**maintenance** 49:7
**majority** 32:6
**management** 10:4,6,7
  10:12,15
**MARDER** 3:7
**mark** 21:15 29:6
**marked** 6:1,2 21:17
  25:18,22 27:15,16
  28:9,11 29:8,20,22
  31:7,8 106:15
**markedly** 49:15
**Maryland** 1:2,15 2:6
  2:11 3:9,17 7:18,20
  112:21
**master's** 52:7
**material** 4:19
**materials** 21:4,6,21
  23:9 28:17 33:7
  46:22 57:5 87:3
**math** 33:22 98:19
**matter** 72:17,18,18
**McCarron** 3:14 12:9
  12:14 20:11,19 21:2
  21:9 26:19 31:19
  36:16 40:4 67:20
  72:7 73:14 91:16
  110:5,6
**mean** 7:8 16:11 18:22
  22:8 23:16 27:22

MICHAEL K. SPODAK, M.D. - 4/23/2013

31:21 39:17 49:4
52:19 53:8 58:22
65:7 67:6 71:14,17
71:19 72:9 73:13
90:19 95:18,21
104:20
**meaning** 23:22 26:15
63:12,21 71:8,15
**meaningful** 46:19
92:20
**means** 67:7 71:20,21
73:15 91:1
**mechanisms** 68:15
**medical** 5:11 7:18,20
13:19 14:1,11 22:6
22:11 23:10 28:16
31:1,13,21 35:9,18
35:19 37:3,8,10,15
39:5 40:2 55:6,11,17
56:1,16,20 57:1,13
82:8 87:2 89:8,11,17
96:2 97:3 103:10
**medicals** 54:21
**medication** 10:4,5,7
10:11,14 11:22 13:17
103:3
**medications** 109:1
**medicine** 105:17
**meet** 69:6 98:2
**meets** 56:1 75:15
108:6,7
**members** 50:3
**mental** 57:16 63:16
102:6,15,17 103:11
**mention** 29:11 68:1
**mentioned** 29:13
**merely** 15:3 71:15
**met** 86:7 97:12 108:4
**MICHAEL** 1:14 2:1,4
4:2 5:2 110:11 111:2
**Michelle** 29:2
**mind** 12:18 82:22
**mine** 51:16
**minimization** 50:19
57:9,16 58:6,12,16

**minimize** 47:7
**minimized** 49:15
**minimizing** 57:7
**minority** 100:11
**minute** 59:6
**minutes** 59:3
**miscellaneous** 22:9,10
23:9 26:18,21
**misprint** 90:21 91:8
**mom** 18:7 46:20 48:15
51:11 60:16 61:6
89:21
**mom's** 29:15
**money** 33:17
**month** 48:20
**monthly** 16:20 17:5,12
36:15
**months** 7:4 109:4,6
**mother** 29:18 44:7
47:20 48:1 49:12
50:15 51:1 58:8,18
59:14,15,19 60:7,9
60:12 61:10,12 62:1
77:20,22 78:5,5,8
80:14 82:1 83:12
87:1 89:9,19 92:12
**mother's** 47:7 50:18
61:21
**motive** 101:18
**motives** 58:10
**motor** 108:15
**multifactorial** 62:12
62:18 66:4,6 71:3
**multiple** 108:12
109:16
**mumbled** 22:22
**mumbling** 5:16
**mute** 88:2,6
**mutism** 4:11 18:11,12
18:16,19 19:11,15
25:5,7,10 26:6 31:20
49:20 65:3,7,14,16
66:3,17 67:5,13,15
67:19 68:3 69:13,19
70:7,15 71:4,6,9

75:22 76:16,19 79:6
82:17 83:8,10,14,17
84:15,19 85:2,5,7,12
85:16,22 86:2,8,13
86:17 87:13,16,20
88:10,12 89:1 90:14
92:3 94:2,17 97:16
97:19 98:7,16,21
99:11,18 100:10,12
101:13 102:21
103:18 105:5,10,19
106:3,20 107:3,15,22
108:5,17
**M.D** 1:14 2:1,4 4:2 5:2
110:11 111:2

**N**

**N** 3:1 4:1,1 5:1
**name** 5:7 24:12 50:7
50:10 97:8
**nature** 75:8 93:18
94:10
**near** 19:6
**necessarily** 71:17
72:22
**necessary** 16:5 109:16
**necessitated** 103:7
**need** 5:20 15:10,14,22
54:19 72:5,13 76:17
76:20 77:2,3 102:6
102:15 103:3 109:5
109:12 110:2
**needed** 9:3 42:19
60:21 108:22
**needs** 63:16
**neither** 28:6 30:9
112:9
**neurocognitive** 43:4
**neurology** 6:9
**neuropsychological**
43:4
**neuropsychologist**
43:5,9
**never** 60:2 61:13,22
103:4

**new** 19:5,12
**newborn** 7:13
**nonevent** 88:10
**normal** 45:12 74:8
104:9
**notable** 93:11
**notarial** 112:13
**Notary** 2:11 112:1,20
**notation** 47:20 50:11
**note** 31:11 47:18,22
48:19 50:7 62:1
**noted** 78:6 82:15
**notes** 4:16,17 28:2,3,4
28:6 29:11,14 31:16
47:9,10,11 48:11,13
49:4 51:2 52:3 53:16
53:22 56:20,21 79:19
79:22 80:16,17
106:13
**notice** 2:9 65:9
**noticeable** 75:3
**number** 12:3 22:8,12
23:10,22 24:6,9,12
24:15,17,18 27:4,19
28:2 34:4 52:4,6
57:13 70:10 77:9
82:20 99:5 102:5
**numerous** 6:15 9:4
20:16

**O**

**O** 3:5 4:1 5:1
**oath** 5:3
**object** 72:7 73:14
**objection** 12:9,14
36:17 67:20 91:16
**obligation** 95:11,17,19
96:6,11
**observation** 89:19
**observe** 60:18
**observer** 59:16
**obsessive** 108:7,20
**obtained** 44:6
**obviously** 5:16
**occasion** 9:1 12:18

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 10

41:9 43:16 51:14,17
**occasionally** 49:9
**occasions** 20:14,15
  51:12 60:11
**occurred** 31:2 51:12
  57:22 87:4 88:5
  103:4 108:21
**occurring** 57:21
**October** 25:2 26:4
**offer** 102:1,20
**office** 21:3 22:16
  31:22 40:5 42:4 52:8
  52:11,15
**officer** 112:3
**offices** 2:2
**official** 88:14
**oh** 94:10
**okay** 5:17 12:12 25:19
  28:2 30:16 54:2
  61:19 84:4 91:9 92:7
  94:6 98:19 99:9
**older** 33:20 48:16
  71:22,22
**once** 22:21 54:14 86:1
  98:10
**ones** 12:2 20:21 25:15
  65:20,21 99:13
**ongoing** 10:13 84:12
  87:6,10,11 101:9
  109:12,22
**online** 25:12,14
**onset** 37:11 108:17
**opine** 85:8
**opinion** 14:10 16:5
  70:21 85:1,4 90:14
  94:5,5 95:8 102:1,5
  102:14,14 103:13
  104:22 105:3,10
  107:20
**opinions** 13:12 73:6
  102:20 107:18
**opportunity** 53:15
  59:18
**opposed** 101:12
**oppositional** 49:7 50:2

**order** 35:7 36:8 60:12
**originals** 28:15
**outcome** 37:16 45:6
  112:11
**outline** 53:2 54:5
**outlined** 45:8 61:20
**outpatient** 8:13,14
**outside** 93:1,4
**overall** 45:19
**o'clock** 76:1

          **P**
**P** 3:1,1 5:1
**packet** 23:8 29:16,17
**page** 4:2,8 25:2 31:6
  47:3,3 77:16 78:12
  80:2,5 89:13 90:17
  100:15,15,15 102:11
  106:15 113:4 114:4
**pages** 1:21 29:21 78:7
  80:17
**pain** 74:19
**paint** 12:4 17:3
**paragraph** 78:7
**paragraphs** 77:17
**parameters** 68:18
  97:13
**parent** 54:13,17,18
  55:21 60:4
**parented** 15:13
**parents** 13:10 46:12
  47:17 101:14 102:4
**part** 7:2 47:7 53:9
  67:19 78:8 86:10
  94:4
**partake** 101:15
**participating** 43:15
  90:12
**participation** 21:3
**particular** 23:18 53:14
  77:12 91:1
**particularly** 25:8 47:9
  93:11
**parties** 112:10
**parts** 35:14

**passes** 57:21
**pathology** 93:12
**patient** 8:18 10:8,12
  11:7 14:18 15:4,21
  17:22 18:10 44:14
  53:17 95:12,13,15
  96:7,13 97:11
**patients** 8:15 9:3 10:2
  10:16 11:4 17:22
  18:3,6 63:16 64:14
  97:15
**PAUL** 1:8
**pay** 36:14
**payments** 36:15
**pediatrician** 51:8 89:5
  90:6 103:9
**peer-reviewed** 67:9
  69:12 75:15 76:18
  77:8,10 85:14 95:7
  96:4
**Pennsylvania** 2:5
**people** 8:10,12 12:20
  58:5 63:7 64:4,6
  68:18 70:7 71:9
  100:3
**people's** 94:22
**percent** 9:14,15,20,22
  32:13,14
**percentage** 32:3,4,9
**perfectly** 74:8
**perform** 44:13
**period** 37:4 39:6,15,22
  48:15 109:4
**Perkins** 33:2
**permit** 61:10
**person** 40:3 55:17
  63:1,4,20 69:1,5
  72:12 74:3 76:16
  97:11
**personal** 9:12 34:21
  35:19 37:8,14
**personally** 41:21
**personnel** 48:18
**person's** 63:10
**pet** 83:1,3

**pharmacologic** 102:7
  103:3
**physical** 70:15,16,19
  71:3 72:9 73:17 74:1
  74:19 105:2
**physically** 27:10 63:2
  63:4,7 70:2
**physician** 38:22
**physiologic** 68:14,15
**pick** 9:9
**picture** 14:8
**piece** 71:3
**pinned** 95:1
**pinpoint** 15:14
**PL** 24:9
**places** 23:22
**plaintiff** 32:4,14,20
  38:13
**Plaintiffs** 1:6 3:4 5:5
**plaintiff's** 22:4 24:9
**plan** 102:1
**play** 67:18
**please** 5:16 21:16
  22:12 24:17 27:7,15
  28:8 29:5 51:3
**plus** 83:12 98:15
**point** 5:20 8:5 34:7
  36:1 39:11,19 90:10
  105:14,16
**poof** 67:5,6
**poorly** 34:12
**population** 18:17
  69:20 98:12 99:13
**Porwick** 3:5 4:3 5:6,7
  6:4 21:15,19 26:2
  27:14,18 28:9,13
  29:19 30:2 31:10
  34:22 35:3 36:18
  76:12 110:4
**position** 38:7,11,14,16
  38:19 85:8
**possibility** 16:7 58:4
**possible** 45:2 64:13
  95:6
**possibly** 22:15 67:10

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 11

post 95:19
posttraumatic 64:7,15
potential 75:13 76:18
powerless 47:18
practice 8:14 10:20
  12:21 16:18,19 40:16
  42:8 46:1,4 63:15
  64:19
Pratt 3:8
Pre 4:21
precipitated 37:5
predated 101:13
predating 47:8,13,15
  57:7 103:14
preexisting 63:22
  74:14 108:13,14
prefer 76:9
preoccupation 82:1
prepared 28:4 30:3,5
  30:10,11,16
preschool 90:10,12
prescribing 11:22
present 34:21 35:8
  59:15,19 60:4,7,12
  61:11 62:1,2 74:10
  74:12 80:15 102:10
  109:2,6
presentation 42:18
presentations 107:14
presented 108:12
presume 22:3
pretty 49:3
prevailing 70:21 94:4
prevalent 18:17
pre-accident 77:21
primarily 25:16 53:9
print 25:11,13,15,15
printed 23:12
printout 25:1
prior 21:7,21 30:16,18
  30:19,20 42:5 45:21
  49:16 50:7,19 53:16
  57:17 74:15 86:17
  87:13,16,20 88:2,15
  88:19

privacy 35:9,18 39:5
  40:2
private 10:20 35:13
privileges 7:14 8:1,2,5
  9:6
probably 9:14,22
  12:17 17:8 32:6,12
  33:19,20 41:4,13
  42:1,7 43:19 52:9
  79:16 81:20 98:9
  101:22 109:15
problem 13:16 14:3
  87:10,11
problems 37:11 47:8
  57:7 84:15 96:13
  103:1,14
procedure 13:9
proceedings 112:4,6,6
process 84:12
productive 59:12
professional 2:10 9:10
  9:11 10:9 16:8 40:16
  112:3
progress 16:1
progressed 79:3
prohibition 12:22
proper 36:15 95:20
prosecution 33:1
provide 9:5 10:18,19
  31:19 37:14 39:8,20
  46:15 95:13 96:7
provided 5:22 10:21
  11:1 21:4,9,13 22:2
  29:10 31:22 39:16
  48:17 57:5 79:21
provider 10:13
providers 93:22
  101:15 105:4
providing 10:3 11:22
  39:12
psychiatric 14:3 43:8
  58:9 67:11
psychiatrist 6:5,17
  13:22 16:8,9,11,12
  96:6

psychiatrists 11:14,16
  12:20
psychiatry 6:9,11,13
  6:20 7:3,5 8:10
  12:16,21 15:3 16:14
  16:15 17:17 39:9,12
  39:21 67:11
psychological 40:12
  40:13,16,21 41:7
  42:14,17,21 43:7
psychologist 43:13
  45:1
psychotherapy 109:2
psychotropic 109:1
PTSD 68:16 69:3,7
  75:19,20
public 2:11 91:14
  112:1,20
published 107:13
pull 24:2,17 25:4 28:8
  29:5
pulled 23:17 65:20
pulling 82:4
purpose 54:22 58:16
purposeful 57:17 58:1
  58:13
purposes 55:20 73:3
  75:10,12
Pursuant 2:9
pushes 47:17
put 12:17 22:14 23:4,8
  23:13 24:22 30:12,13
  93:1 101:11
putting 25:19 108:1
P.A 2:4
P.M 35:2 76:11,11
  110:12

—— Q ——
qualifications 69:6
qualified 12:6,7,13,16
  38:22
question 5:11,17
  12:10 15:17,18 34:12
  48:1 56:12 62:19

72:11 73:10 77:3
  83:22 85:3 86:19
  87:18 91:1,3,7 96:5
  102:13,16 105:19
  109:10
questioning 36:17
questions 15:17 22:7
  34:20 35:5,17,19
  36:5 37:8 55:5 79:14
  80:19 81:11,12 83:2
  83:7,11,16,16,17
  84:3 92:20 110:5
quizzed 94:9
quotations 77:17
quoting 95:7

—— R ——
R 3:1 5:1 113:1,1
  114:1,1
range 41:14 51:19
  59:3,6 110:1
rapport 93:17
rare 97:19 98:7
rate 33:14,15
reaching 14:10
reaction 15:12
read 25:12,14 45:9,17
  65:17 78:17,20 94:6
  94:18,22 95:3 98:10
  98:14 99:3,19 100:5
  100:8 110:6,8 111:3
reading 107:17
ready 19:5 76:13
realize 109:9
really 14:14 16:21
  26:15 49:3,15 50:5
  65:17 70:4 75:7,17
  95:1 99:4
reason 45:3 109:19
  113:4 114:4
reasonable 13:19 14:1
  14:10 82:7
reasons 23:7
rebuttal 22:4
recall 18:13 20:21,22

MICHAEL K. SPODAK, M.D. - 4/23/2013

26:15 38:5 41:18
46:3 51:1 61:16
65:11 79:16 80:14
84:10 94:21,22
100:19,20
**recalled** 84:8
**received** 28:17 46:22
47:9 101:2 102:18
**receiving** 35:20 36:1
45:22
**Recess** 76:11
**recollection** 42:10
44:5 48:3,22 61:21
78:21 79:10,12,13
**recommends** 109:2
**reconcile** 55:18
**record** 35:4 50:13
55:17 89:17 112:5
**records** 20:7 21:14
22:6,11,14 23:3,10
23:11,17,17,19,21
28:16 31:2,5,13,15
35:11 37:13 38:12
45:17 46:21 48:14,18
49:14,17 50:1,22
51:6 54:21 55:6,12
56:2,16,17,20 57:1
57:13 78:5 87:2,8
88:17 89:8,11 97:3
**recovered** 109:7
**redacted** 29:11 47:10
47:11 50:8
**reduce** 15:11 101:10
**reduced** 47:20 48:1,5
48:7,9 112:7
**reducing** 15:5
**refer** 9:8
**reference** 66:15
**referenced** 65:22
69:18 87:7
**referencing** 65:19
90:5
**referral** 43:18
**reflected** 47:9
**refresh** 44:5

**refuse** 35:6
**refused** 49:13
**refute** 106:6
**refuted** 106:8
**regard** 20:22 42:21
47:12
**regarding** 19:15 21:6
26:5 31:16,20 34:14
35:5,17 49:18 50:13
50:14 64:22 65:5
66:3 96:8 98:16,21
103:22 104:3
**Registered** 2:10 112:2
**regularly** 90:6
**related** 25:16 38:9
102:19 112:9
**relating** 29:12
**relevant** 79:7
**relive** 82:3
**reluctant** 79:2
**rely** 55:3
**relying** 68:5
**remainder** 10:1
**remaining** 9:14
**remember** 11:9 57:21
58:2
**remembered** 79:17
**remembering** 80:16
**reminded** 84:13
**rendered** 37:1
**repeat** 10:10
**report** 21:10,13,22
22:3 26:10 29:4,4
30:21 40:21 42:16
44:4 45:8,9,22 69:17
77:14 78:6,17,20
79:19 82:16 88:22
89:12 90:10,13,18
93:6,9 95:12,13 96:7
96:12,18,20 97:4,10
107:17
**Reported** 1:22
**Reporter** 2:10 35:2
112:1,3
**reporting** 14:19 98:4

**reports** 4:20 70:7,14
76:15 98:2
**represent** 5:8
**represents** 100:10
**require** 103:10
**required** 105:7
**requires** 8:19
**requiring** 60:12
**research** 25:9 26:3,5
26:11 31:20 68:5
70:6 76:20 77:2
96:15 98:2,4 99:20
99:21 105:20 106:5
**researched** 97:21
**residency** 6:22 7:2,6
**residual** 36:19 38:9
39:7
**resistant** 92:22
**resistive** 91:18
**resolve** 55:15 56:4
**respect** 34:19
**respectfully** 37:7
**response** 15:9 90:18
90:20 104:6,9
**responses** 64:22 65:5
79:7 92:20
**responsive** 90:22 91:2
91:6,7 93:2,15
**restate** 5:12
**result** 48:2 100:12
102:8,16 103:11
105:5
**retained** 32:8,10
**reticent** 91:21 92:1,7
**return** 28:15 113:3
114:3
**returned** 48:8
**review** 15:2 16:5 20:7
21:6 23:5 24:16 25:8
31:16 33:7 51:3,5
53:15 69:11 70:13
87:2 88:17 94:13
100:21 105:22
106:13
**reviewed** 21:21 26:9

28:7 30:22 49:17
50:21 66:7,13,15
69:18 97:3
**reviewing** 50:1
**revoked** 8:2
**Richmond** 40:4,8
41:21 43:3,14 44:13
45:21 46:6 62:3 93:6
93:9
**Richmond's** 45:6
**right** 6:6 8:16,21
16:10 19:7 29:16
31:3,17 32:21 34:15
36:11,15 37:1,6,12
37:17 40:8 43:21
50:4,12 51:13 60:14
61:2,7 62:18 65:22
67:5 74:7,20 76:15
76:22 77:16 79:22
87:14 89:9 90:7
91:15 95:5 98:17,21
99:12,20 106:17
107:15 109:13
**rigmarole** 36:7
**rise** 105:7
**risk** 108:13
**role** 20:2,5
**room** 59:15 60:8 80:6
80:10
**rule** 66:22
**ruled** 66:6,16 94:16
99:22 103:19 106:10
**rules** 47:17
**Ruth** 24:13 29:11
47:10,12 94:18

---

**S**

**S** 3:1 4:1,6 5:1 113:1
114:1
**SALSBURY** 3:6
**saw** 30:19 44:7 51:7
62:3 70:17 89:5,16
96:13
**saying** 61:16 95:9
**says** 13:15 14:6,12

MICHAEL K. SPODAK, M.D. – 4/23/2013

Page 13

22:8 28:2 50:8 72:21
75:20 76:20 106:21
**scab** 82:4
**scale** 9:11
**scared** 81:2,4
**scenario** 15:9 74:11
**scenarios** 15:20 91:14
**schedule** 44:9,11,12
47:21 48:1,5,8,9
**scheduling** 44:15
**school** 23:10 31:5,14
44:16 54:21 56:16
83:1,4 84:4 92:13
**science** 52:7 106:5
**scientific** 67:7
**scratching** 48:22
49:10
**screaming** 48:21
49:10
**seal** 112:13
**search** 26:7 64:21 65:5
65:12
**second** 51:17 77:17
**secretary** 30:13
**section** 54:1
**see** 10:16 11:11 14:8
14:19,20 16:17 17:6
17:6 23:6 25:8 26:7
26:11 27:7 50:5
59:18 62:3 76:17
77:5 88:1 93:16 94:2
94:9 95:12 96:18
97:12 100:21 105:20
110:2
**seeing** 8:15 10:2 30:20
**seen** 10:8,12 67:12
85:13 90:6
**selective** 4:11 18:11,12
18:15,19 19:11,15
25:4,7,10 26:5 31:20
49:20 65:3,7,14,16
66:3,17 67:5,12,15
67:19 68:3 69:13,19
70:7,15 71:4,6,9
75:22 76:16,19 79:4

79:6 82:17 83:8,10
83:13,16 84:14,19
85:2,5,7,12,16,21
86:2,7,13,17 87:13
87:16,20 88:9,12
89:1 90:14 92:3 94:2
94:16 97:16,18 98:7
98:16,21 99:11,18
100:10,12 101:13
102:21 103:18 105:5
105:10,19 106:3,20
107:2,15,22 108:4,17
**selectively** 88:2,6
**Semmes** 3:15,15 20:16
20:16
**sense** 5:11 59:10
**separate** 8:10 31:4,16
**September** 44:4
**series** 35:5
**serious** 37:10 73:18
**seriously** 70:1
**service** 33:2
**services** 24:14 39:9,13
39:21
**set** 112:12
**setting** 8:16 9:13 10:3
10:17 11:12 12:2
13:2,5,6,9,13,20 14:4
15:7,22 17:10 18:4
49:13 73:6 95:13,22
**settings** 52:22
**settlement** 37:21
**severity** 47:7
**sexual** 70:8,20 71:2
**SGAH** 27:19
**Shady** 27:22 28:1
**Sharon** 1:22 2:9 112:2
**shattered** 80:21
**sheet** 4:14 111:7
**Shipon-Blum** 100:6
**shirt** 91:5
**shock** 70:1
**shoe** 71:18,22
**short** 48:15
**SHORTHAND** 112:1

**shortly** 88:6
**show** 100:16 106:14
**showing** 88:22
**shows** 74:19
**shrug** 92:16
**side** 32:18 73:20 74:18
93:2
**sign** 110:7,9
**Signature** 110:10
111:10
**signed** 111:7
**significance** 23:18,19
55:12 81:14,17 90:9
**significant** 22:20 23:1
23:2,3 47:6 50:22
87:4 105:1 108:16,19
**signs** 87:12,20 88:14
88:22
**similar** 32:9
**similarities** 97:10
**Simon** 24:13 29:12
47:10,12
**Simon's** 94:18
**simplify** 27:3
**simply** 13:14 14:6 56:4
60:20 66:22 105:7
106:11
**single** 69:16
**sister** 48:16 49:5 50:10
87:7 92:12
**sit** 47:1 60:7
**sitting** 59:15 83:12
**situation** 14:5 49:16
93:15
**six** 7:4 98:15,18 109:4
109:6
**six-year-old** 59:12
**size** 34:5 71:20 72:2
**sizes** 71:18,22
**skin** 82:5
**slash** 26:18
**slip** 74:7
**sole** 71:5
**somebody** 43:19
**somewhat** 79:4 83:5

92:21
**sorry** 15:18 22:21 28:1
54:14 80:13 90:21
91:8
**sought** 40:7
**sources** 13:11 22:11
55:4 108:2
**South** 3:16
**speak** 37:13 38:12
42:5 54:5 62:14 79:2
91:21 92:1,8 93:13
**speaking** 61:17 79:7
89:13,19 91:14 93:13
**specialist** 12:15 109:6
**specialty** 8:12
**specific** 13:18 15:6
16:3 18:1 20:21 34:4
53:12 58:16 68:12,17
73:2,5 95:19 100:1
100:22 103:5 107:2
110:2
**specifically** 19:18
26:15 41:1 42:12
46:3 48:12 55:8 64:3
65:11 79:16 85:19
94:21 100:20
**specifics** 94:13
**speculation** 100:4
**speech** 50:8 53:5
**speller** 71:21
**spellers** 71:19 72:1
**spelling** 72:2
**spend** 53:11,13
**spent** 34:6 37:4
**split** 9:18
**Spodak** 1:14 2:1,4 4:2
4:8,9,15,16,17 5:2,7
6:2 21:17 25:22
27:16 28:11 29:8,22
31:8 110:11 111:2
**spoke** 79:5 82:12,16
92:4,5
**spring** 27:21 87:5
**staff** 42:4
**stand** 27:20

MICHAEL K. SPODAK, M.D. – 4/23/2013

**standard** 42:7,12,22
  43:7 46:1,4 48:10
  53:2 54:4 55:5 75:15
  77:7 96:2,4 98:2,3
**standardized** 96:15
**start** 105:18 106:3,4
**started** 51:15 89:14
**starting** 105:16
**state** 2:11 33:2 44:17
  63:11 67:11 76:21,22
  82:7 106:7 112:21
**stated** 89:13
**States** 1:1 99:12
**status** 57:17
**stay** 82:15
**stenographically**
  112:7
**stick** 46:5
**sticker** 25:19
**sticks** 46:8
**stop** 36:1
**stopped** 39:11,14 51:4
  51:10 90:11 94:12
**stories** 98:5
**story** 82:4
**stranger** 93:13
**Street** 3:8,16
**stress** 64:7,15 108:15
**stressors** 92:14 108:14
**striking** 73:22
**struck** 74:17,20
**studied** 99:14 100:3
**studies** 66:16 77:10
  94:14 100:1 106:10
**stuff** 91:11,12
**subcontract** 52:17
**subcontractor** 52:16
**subject** 102:8
**submitted** 98:15
**submitting** 21:12
**subscribe** 19:4 90:9
**subspecialties** 6:10
**subspecialty** 6:14
**substance** 49:14
**substantial** 50:22

**substantive** 59:9
**substantively** 47:4,5
**suffer** 69:2 99:11
**suffered** 36:22 74:9
**suffering** 69:5
**suffers** 73:19
**sufficient** 37:4,6
**suggest** 64:9 71:1
**suggested** 45:18 51:4
**suggests** 66:3 85:15,18
**Suite** 3:8,16
**summarize** 99:1
**summarizes** 99:4
**summary** 78:9 80:3
**summer** 19:22 51:10
  61:6,9,15 81:21 86:8
  86:10,13 87:5,17,21
  88:3
**supervision** 112:8
**sure** 7:7 9:4 10:11
  23:3,16 25:21 45:2
  56:18 62:19,20 63:9
  67:9 68:4 72:10
  73:16 79:20 82:9
  90:13 101:6 104:21
**surprised** 45:16
**suspect** 19:16 96:8
**suspended** 8:2
**switch** 89:22
**symptoms** 15:5 63:21
  64:1,3 73:5 87:20
  88:15,18 89:1,6
**synopsis** 109:8

―――――――――――
          **T**
―――――――――――
**T** 4:1,1,6 113:1,1
  114:1,1
**tab** 4:12,15,16,18,19
  4:20 24:22 25:20
  26:17 27:14 29:6,6,7
  65:20 68:6
**table** 4:10 21:11 26:17
  28:18,22
**take** 13:15 14:6 15:3
  52:18 71:8 73:4 75:4

  76:4,5,7
**taken** 48:15 112:4,6
**talk** 9:10 10:13 40:3
  60:9 61:13,14 75:1
  78:16,21 79:5 82:11
  82:14 84:3 91:11,12
**talkative** 79:3
**talked** 75:11 79:1 81:7
  82:22
**talking** 51:4,10,15
  68:15 72:20 73:17
  75:18,18 82:6 89:22
  94:12 101:12
**tangentially** 50:16
**tantrums** 87:9 88:19
  103:16
**task** 42:13
**taxes** 34:10
**teacher's** 90:10
**tell** 5:10,16,20 34:22
  44:3 47:1,12 50:17
  51:20 61:1 78:10
  81:2,4,7,10 97:20
  106:12
**temper** 87:8 88:19
  103:16
**temporally** 64:5
**temporary** 104:21
**ten** 9:22 91:20
**tend** 68:18 71:19,22
  72:1 73:4
**tender** 60:3
**ten-year-old** 84:6
  93:13
**term** 8:11 71:7
**terms** 7:8 13:4 14:17
  24:21 43:21 55:22
  59:4 72:19 93:11
  108:3
**terribly** 91:20
**test** 43:1
**tested** 45:12
**testified** 5:4 12:12
  94:19 100:8
**testify** 16:6 32:3,5,11

  58:11,15
**testifying** 75:10 96:1
**testimony** 32:6 33:10
  75:14 100:19 111:4,5
**testing** 40:12,13,16
  42:15,17,21 43:7
  45:15 96:15
**tests** 40:21 42:15
  44:22
**texts** 31:21
**Thank** 22:13 24:15
  27:7 28:8 29:5 54:2
**therapist** 109:3
**therapists** 82:2
**therapy** 10:3,6,9,13
  11:22 13:17 16:2
  109:13,19
**thereabouts** 18:6 26:4
**Theresa** 29:3
**they'd** 26:14
**thing** 29:10,19 75:21
  93:12
**things** 12:5 22:8,19
  23:1,5 27:3 30:12
  34:11 36:8 45:4 50:9
  53:3,12,13 56:21
  60:10 79:4 81:18
  82:13,19 83:19 91:18
  92:11,11,12,13
  109:11 110:1
**think** 11:13 13:8 14:12
  15:1,16 16:3 17:8
  22:19 23:1 24:4 25:2
  26:22 29:13 34:19
  38:17 40:1,12 44:19
  46:15 47:4,6 48:17
  51:1,8,12 55:2,6 56:3
  56:4 57:6,15 58:14
  60:6,18 68:15,21
  69:21 70:4 73:6,19
  74:1 75:10 79:21
  80:15 82:5,18 84:20
  85:6 88:4 90:3 91:18
  93:3,10 95:18 96:11
  96:15 98:10 101:21

MICHAEL K. SPODAK, M.D. - 4/23/2013

102:3,19,20 104:9,18
105:9 106:9 107:1,3
108:9 109:7,12,14,15
109:22
**THOMAS** 3:14
**thought** 23:17 40:11
42:15 49:15 59:13
70:9 77:20 92:21
94:4,19 109:10
**thousands** 98:8,9,10
98:13 100:9
**three** 17:6,8 58:3
80:17
**throwing** 87:8
**till** 45:17
**time** 9:10,11,12,20
11:7 22:2 23:16
28:17 32:3,5 33:8,10
33:20 34:6 35:1 37:4
39:6,11,19 47:14
48:11 53:13 55:22
57:21 63:11,13 68:17
74:4,9 87:13 88:21
89:2 93:14 102:9,9
102:10,10 109:7
**timeline** 4:21 23:4
29:20 30:3,5,12,14
30:16,22 31:3,5,12
31:14
**times** 5:9 9:4 56:18,19
57:20 85:6 91:9
93:16
**TODD** 1:5
**told** 16:17 55:16
**top** 25:1 78:7 80:2
**topic** 65:12 77:1
**topics** 82:10 83:3
**total** 81:22 100:4
**totally** 49:10
**Towson** 1:15 2:6
**training** 7:5
**transcribed** 80:15
**transcribing** 80:7,11
**transcript** 4:7 6:3
21:18 26:1 27:17

28:12 29:9 30:1 31:9
53:5 80:3 112:5
**transcription** 111:5
**trauma** 60:1,2 66:6,16
67:2 69:17 84:20
94:15 103:19 104:19
104:20 105:2,19
108:18,21 109:3,6
**traumatic** 12:4 17:2
62:6,8,11,17 63:17
64:22 65:5 68:19
69:14 71:2 75:20
76:17 85:15,18,20
97:16 99:18,22
100:13 104:12,13,17
106:2
**treat** 12:8,13,17 13:1
15:15 18:3,5 73:4
**treated** 18:10,13 63:16
63:20 64:4,6,14
100:9,11 103:17
**treating** 11:19,21
12:19,22 13:14,22
14:17 15:21 16:11
17:22 18:11
**treatment** 10:18,21
11:2,13 29:12,15
72:22 75:13 97:7,7
101:1 102:7,15,18
103:11 108:22
**trial** 102:2
**triggering** 15:9
**truck** 104:4,8,10
**true** 105:21 106:1
111:4
**try** 15:19 55:14,20
58:1 59:9 106:4
**trying** 13:11 59:10,21
75:14
**Tuesday** 1:16
**turn** 30:13
**two** 9:17 17:6,8,15
29:14 49:8 51:6,12
60:11 65:10 80:17
89:14,16,17 102:2

**type** 15:12,13 30:8,14
53:4 93:18
**typed** 27:8,10,13 30:7
**types** 106:22
**typewriting** 112:8
**typical** 46:10 59:4
104:6
**typically** 7:11 8:13
15:2 16:4 43:2 44:9
44:11,12 54:18 92:19
**typist** 27:13

---
**U**

**ultimately** 32:10
**uncommon** 66:19
**uncontrolled** 87:9
**undergo** 38:3
**undergoing** 38:5
**undergone** 44:22
**underlying** 14:18 82:5
**understand** 5:10
12:10 15:18 31:11
56:12 62:19 72:10
77:2 85:1
**understanding** 38:14
38:18 45:10 65:13,15
**understood** 20:3,6
**unfavorably** 7:21
**unique** 13:9
**United** 1:1 99:12
**unreported** 97:17
**unsealed** 35:11,14
**unusual** 59:8 93:4
**unwilling** 35:16
**updated** 26:8,12
**upset** 60:9
**upsetting** 92:15
**use** 51:20 70:11,11
71:7 75:13
**usually** 12:1,19 13:18
17:15 33:13 43:11
60:7

---
**V**

**v** 1:7 3:14 113:2 114:2
**Vaca** 29:2

**vague** 51:6 79:12,13
91:9,10 92:16
**valuable** 53:1
**value** 13:16 14:6 15:4
73:4
**varies** 44:15
**variety** 12:4 13:11
22:11 44:18 60:10
69:9
**various** 28:7
**vast** 32:6
**vehicle** 108:16
**verbal** 50:2,6,6 51:8
**version** 19:12
**versus** 32:4 55:11 56:1
56:15 57:3
**visit** 103:8
**vitae** 4:9
**vocabulary** 79:8
**voluminous** 54:20

---
**W**

**waiting** 60:8
**waived** 110:10
**walked** 51:15
**want** 22:7 23:5 35:5
36:5,8 42:17 45:8
52:4 68:4 76:6 78:17
82:15,18 83:11
100:15
**wanted** 25:8 30:12
60:6 61:2,3,22
**wanting** 60:4
**wants** 76:5
**wasn't** 43:14,14 56:7
56:10,14 58:17 59:14
61:7 74:10 81:13
90:1 92:13 97:8
**way** 7:8,17 8:3 15:12
48:22 97:9 100:22
101:8 102:1 105:17
106:12
**week** 17:15 33:21
**weekly** 17:13,14 109:2
**weeks** 51:7 89:8,14,16

MICHAEL K. SPODAK, M.D. – 4/23/2013

89:17 94:11
**weighted** 32:13,14
**well-defined** 68:17
**went** 23:17 97:17
**weren't** 95:1
**West** 2:5 3:8
**we'll** 28:14 29:6
**we're** 7:7 19:5 31:6
  76:1
**we've** 75:10
**WHEREOF** 112:12
**Wikipedia** 4:19
**witness** 28:3 110:8
  112:12
**worded** 34:12
**words** 50:18
**work** 9:19 24:21 32:2
  32:19 33:5,18 35:12
  38:8 41:5,11 42:20
  42:22 43:10,11,14
  47:20 48:1,5 52:22
  73:11
**worked** 20:11,18 41:4
  41:8
**Workers** 32:16
**works** 33:22 105:17
**world** 99:12
**worldwide** 98:9
**worried** 104:4
**worse** 64:4 72:21
**worsening** 108:19
**wouldn't** 13:21 15:19
  18:9 32:17 57:11
  93:1 96:22
**wow** 97:9

**X**

**X** 1:4,5,6,7,8,9,10 4:6
**x-ray** 74:19 75:4

**Y**

**yeah** 18:21 29:17 59:1
  60:6 62:15 65:8
  79:12 82:5,12 89:3
  95:9,22 109:22
**year** 9:17 17:8 19:9

**yearly** 17:5
**years** 6:15 11:10 16:22
  17:9 19:16 20:17
  32:12,13,15,22 41:5
  49:8 52:10 56:10
  58:3 60:3 90:16
  109:5 110:3
**yelling** 50:3
**young** 46:17 90:7

**Z**

**zeroing** 53:3
**Zimnitzky** 22:5 26:9
  32:1 65:22 68:8
  69:16 98:16 103:2
**Zimnitzky's** 29:3
  65:10 107:17

**0**

**07** 47:16,18

**1**

**1** 1:21 4:9 6:1,2 78:7
  98:11 106:15
**1-231650** 1:20
**1:00** 76:1
**1:02** 76:11
**1:27** 76:11
**10** 4:22 31:7,8,15
  33:21 34:7 80:5
**100** 9:11
**11** 1:7 98:14,20
**11:30** 1:17
**114** 1:21
**12** 7:11,12,13 41:13,19
**12th** 30:19
**12-year-old** 41:20
**12:11** 35:2
**13** 27:9
**14** 29:20
**1400** 3:16
**15** 33:21
**15,000** 34:7
**1580** 1:7
**16** 4:12 24:17,19,22
  25:20 65:20 68:6

**17** 4:15 26:17 27:7,14
  98:20
**17th** 48:19
**18** 7:12
**18th** 47:15
**1980s** 41:13

**2**

**2** 4:10 21:16,17,20
  77:16
**2nd** 37:11 39:2
**2:18** 110:12
**20** 41:14,19 52:10 59:3
  59:6
**20-plus** 41:5
**2002** 37:11 39:2
**2006** 34:13 36:9
**2007** 36:3 47:14
**2008** 20:9 36:3 48:19
  49:5,12 81:21 86:8
  86:13,18 87:5,14,17
  87:21 88:3,5,16 89:6
  90:5
**2011** 20:1 25:2,3 26:4
**2012** 27:2,9 33:18,21
  45:18 61:6,15,17
**2013** 1:16 112:14,16
**21** 4:10
**21201** 3:9,17
**21204-5001** 2:6
**22** 27:19 112:16
**23** 1:16
**25** 3:16 4:11
**26** 2:5
**27** 4:13,16 28:2,8
**28** 4:16
**28th** 89:5 90:5
**29** 4:17,19,20,21
**29th** 112:13

**3**

**3** 4:11 25:19,22 26:16
  65:21 89:13
**3:45** 80:14
**30** 9:14 32:14 59:3,6
**300** 3:8

**31** 4:22
**337-0343** 2:7
**36** 27:4
**39** 28:19

**4**

**4** 4:13 27:15,16 102:6
**4:20** 80:14
**40** 4:18 29:5,6 32:14
  52:6 54:1
**40,000** 98:11
**41** 4:19 29:5,6
**410** 2:7 3:10,18
**45** 4:20 28:21 29:5,7
**450** 3:8
**480** 33:22

**5**

**5** 4:3,16 22:8,12 23:10
  23:22 24:15 28:10,11
  106:16
**5,000** 33:16
**5-15-08** 102:8
**500** 33:6 99:8
**539-5040** 3:18
**539-6633** 3:10

**6**

**6** 4:9,17 24:6 29:6,8
  54:3 78:7,8,12 90:17
**60** 32:12
**60/40** 9:18
**65** 18:6

**7**

**7** 4:19 24:9 29:7,8
**70** 9:15,19 18:6 32:13

**8**

**8** 4:20 29:7,8 47:14
  80:3,5 102:11

**9**

**9** 4:21 24:12 29:20,22
  31:13